UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DANIEL LEE BECKLEY                                          CIVIL ACTION

VERSUS                                                             NO. 22-860

TIM HOOPER, WARDEN                                      SECTION "I"(2)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing § 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.[1]  For the following reasons, I recommend that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

## I.    FACTUAL BACKGROUND

Petitioner Daniel Lee Beckley is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]  On September 29, 2017, Beckley was charged by a bill of indictment in St. Charles Parish with obstruction of justice and second degree murder.[3]  Beckley

---

[1] A district court may hold an evidentiary hearing only when the petitioner shows either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence (*id*. § 2254(e)(2)(A)(ii)) *and* the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.  *Id*. § 2254(e)(2)(B).

[2] ECF No. 4, at 1.

[3] State Record Volume (hereinafter "St. R. Vol.") 4 of 18 at 8, Bill of Indictment, 9/29/17.  On June 22 and August 11, 2016, Beckley was originally charged in two separate cases.  *See* St. R. Vol. 11 of 18 at 12, Bill of Indictment, 16-0263, 6/22/16; *id*. at 59, Bill of Indictment, 16-0468, 8/11/16.

pled not guilty on October 2, 2017.[4]  The Louisiana Fifth Circuit Court of Appeal summarized the

established facts as follows:

> On April 22, 2016, Michelle Price and defendant, Ms. Price's live-in boyfriend of
> nine years, went to the Kenner Police Department (KPD) and reported that Miss
> White, Ms. Price's sixteen-year-old daughter, was missing from their home in
> Kenner.  They advised Deputy Gabriel Castro that defendant had last seen Miss
> White at home that morning at approximately 2:45 A.M., and that she was not at
> home when he returned at 3:15 P.M.  Deputy Castro testified that defendant pulled
> him off to the side and told him that Miss White was known to associate herself
> with alleged drug dealers.  The deputy subsequently advised Ms. Price and
> defendant that Miss White would be entered into the National Crime Information
> Center database as a runaway juvenile.  Deputy Castro noted that Ms. Price
> appeared to be calm, but that defendant looked nervous and uneasy.
>
> Miss White's body was found on April 24, 2016 by a family that spotted a
> nude body in the ditch on St. Rose Avenue in St. Charles Parish.  They pulled over
> and called 9-1-1.  After confirming that there was a body in the water, Deputy
> Randolph McClendon of the St. Charles Parish Sheriff's Office (SCPSO) informed
> dispatch that there was a body.  Deputy Scott Harrell responded, shut down the
> road, contacted detectives, and started a "crime scene log."  Detectives posted
> information on their Facebook page in an attempt to identify the body, specifically,
> that the body was a black female with green and pink curlers in her hair.  Ms. Price
> contacted SCPSO and informed detectives that she believed the body was her
> daughter.  Dental records later confirmed that the body was that of Miss White, Ms.
> Price's minor daughter.
>
> Dr. Marianna Eserman, the Deputy Coroner for Jefferson Parish, performed
> an autopsy on the victim and found that her body was in an advanced state of
> decomposition with extensive breakdown of her tissues.  At trial, Dr. Eserman
> testified that the victim's body was so decomposed that they were unable to tell
> what specific injury caused her death, but concluded that the cause of death was
> homicidal violence of unknown means and the manner of death was homicide.  She
> stated that strangulation or suffocation could not be ruled out.  Elizabeth Hamilton,
> a DNA analyst at the Louisiana State Police Crime Lab, was accepted as an expert
> in the field of forensic DNA.  Ms. Hamilton testified that she examined several
> items, including a sexual assault kit from the victim, a sheet from her bed, a pair of
> blue jeans found in defendant's car and oral swabs from defendant.  Based on her
> analysis, there was a very high probability that the seminal fluid found in the
> victim's cervical, perineal, and anal areas belonged to defendant.
>
> Detective Aaron Savoie testified that he obtained a search warrant for Ms.
> Price's residence, where defendant resided.  He testified that when they arrived at

---

[4] St. R. Vol. 4 of 18  at 1, Min. Entry, 10/2/17.

Ms. Price's residence, the street was filled with people who were saying, "He did it, he killed the girl," and that those people were referring to defendant. Detective Dewhirst testified that those people were trying to get to defendant and kill him, and that when they arrived, the door of the residence had been kicked in.

On April 24, 2016, Jason Troxler, a SCPSO crime scene technician, took photographs and collected evidence at the St. Rose Avenue crime scene, where the victim's body was found, and at her residence. Mr. Troxler testified that he took photographs of the tire impressions located in the grassy area between St. Rose Avenue and the drainage ditch, and that he recovered a green bungee cord from near the ditch in close proximity to the body. He noted that the black cap was missing from one of the hooks on that bungee cord. Mr. Troxler also identified photographs he took of defendant's wrists, which had marks on them. Dr. Eserman, the coroner, testified that the marks on defendant's wrists could be consistent with fingernail scratches.

At the victim's residence, Mr. Troxler took photographs of defendant's 2002 Cadillac and the residence. He found a bag of curlers or rollers inside a dresser and a package of bungee cords inside a kitchen drawer. Mr. Troxler identified a photograph of a black cap that was found inside defendant's trunk, the black cap itself, and a photograph of water bottles defendant kept in his vehicle. Mr. Troxler measured the tires on defendant's vehicle and identified photographs of his measurements.

Detective Joseph Dewhirst, the lead detective investigating this homicide, testified that he compared the tire marks on the road where the body was found to the tires on defendant's vehicle, and found the tires marks and defendant's tires were very similar. Detective Dewhirst also testified that he took a videotaped statement from defendant, which was played at trial. In the statement, defendant asserted that Miss White was having sex with three or four boys and that she "slipped back into doing some of the things she had been doing," specifically some "stupid" things, such as setting up boys to get beaten up. Defendant suggested that something possibly happened to her out of retaliation. Defendant also said during his statement, "What are you not getting from me?" and that he hoped that she "changed her mind," "tried to fight him off," and "went down swinging." Defendant further told Detective Dewhirst that he did not engage in sexual activity with the victim and that he did not know what happened to her. He said that he told Miss White goodbye before he left for work at approximately 2:00 to 2:30 A.M. on April 22, 2016.

According to Detective Dewhirst, defendant said the scratches on his wrists were made by people trying to get into the house. Detective Dewhirst testified that he found out from Ms. Price that she and defendant had recently purchased the bungee cords from a U-Haul store. Although the box of bungee cords was supposed to contain several different colors and sizes, the box found in the kitchen drawer was missing all of the green bungee cords. Detective Dewhirst stated that the bag

of curlers retrieved by Mr. Troxler contained all green rollers and the pink ones were missing from the bag. He explained that the pink rollers were in the victim's hair and that one green roller was found at the crime scene on St. Rose Avenue.

Detective Dewhirst testified that they found a pair of blue jeans and a black rubber cap in defendant's trunk, and that they suspected the rubber cap was the missing cap for the green bungee cord that they found at the St. Rose crime scene. When he called Ms. Price, she told him that she had not had contact with defendant since the night they came to headquarters, and that she would not allow defendant to come back to the house. Detective Dewhirst maintained that once he obtained the DNA results, he knew defendant was lying when he said there had been no sexual contact between him and the victim.

Based on surveillance footage, the police found that defendant's actions and whereabouts on the night and following morning of Miss White's disappearance were as follows. Because defendant's vehicle had a very distinctive tail strip on the trunk which could be seen on the video, police were able to follow its route. Between 11:15 P.M. and 12:15 A.M., defendant's vehicle was pulled in with its "nose" to the house in the yard of his residence and defendant was backing the car out, turning it around, and then reversing it into the driveway by the side door. After defendant turned his vehicle around at 12:13 A.M., the lights then went out. At 12:25 A.M., the headlights came on, and defendant's vehicle traveled down Phoenix Street toward 27th Street. At 12:35 A.M., defendant's vehicle turned around and headed back toward the area where the victim's body was found.

At 12:57 A.M., defendant stopped at a Discount Zone to get gas and air; and while there, opened his trunk, manipulated something white, and readjusted things. The detective noticed from the video that defendant's vehicle did not turn very well due to the extra wide tires. At 1:05 A.M., defendant's vehicle returned home, pulling in straight. Defendant left again at 2:30 A.M. for work.

Detective Dewhirst further testified that he showed Ms. Price a video of the neighborhood children walking to the bus stop on the morning of April 22, 2016, and that Ms. Price stated Miss White was not in that video. This was confirmed by Ms. Price during her testimony.

Several fact witnesses testified at trial: Ms. Price, Tara Collins, Debbie Bordelon, Nicole Celestine, Patricia Carter, and Katrice Reid.

Ms. Price, the victim's mother, testified to the following at trial. Defendant, who she continually referred to as "the monster," had been her boyfriend for nine years and had been living with her since January of 2007. Ms. Price last saw her daughter on the night of Thursday, April 21, 2016, before she left for work. After her night shift, Ms. Price returned home between 8:00 and 8:30 A.M. on April 22, 2016. When she entered the house, she noticed that there was a lot of dirt and mud on the floor by the side door, which she thought was "weird." Ms. Price realized

her daughter was missing when "Travina" called her at approximately 6:45 P.M., and asked if Miss White was with Ms. Price. Ms. Price answered, "no," and said she thought her daughter was with her.

After Ms. Price realized her daughter was missing, she told defendant, who got up quickly and suggested they go to the police station. Ms. Price thought it was odd that defendant did not first suggest they call some friends, as Miss White had never run away and was not the type to run away. After going to the police, Ms. Price put up fliers, put a post on Facebook, and sent text messages to family and friends in an effort to find Miss White. She also looked for things that were out of place in the house. During her search, she noticed that Miss White's school uniform was missing. Ms. Price later found one of Miss White's Bonnabel High School uniform shirts in a tote full of defendant's clothing. She explained that it looked out of place like it had been shoved down between defendant's clothes. Ms. Price also found Miss White's key in defendant's watch box, which had been in Ms. Price's top drawer. Defendant was the only person other than Ms. Price who knew where the key was. Ms. Price also discovered that some large white towels were missing from her bathroom. Finally, Ms. Price testified that although Miss White was found with pink curlers in her hair, she normally would never have left the house voluntarily with curlers in her hair.

One of Ms. Price's cousins, Tara Collins, testified at trial. She testified that she knew Miss White all of her life. When she found out Miss White was missing, Ms. Collins went to Ms. Price's house to try and help. While she was there, defendant called her aside, which she thought was unusual as she did not know him well. During their conversation, defendant told her that they were not going to find Miss White. Ms. Collins wanted to walk around to see if there were any cameras, but defendant did not want to do that. She recalled that every time she saw Miss White, her hair was beautiful and that she always took care of herself. Ms. Collins described Miss White as very quiet and very shy like her mother.

Two neighbors on Ms. Price's street, Debbie Bordelon and Patricia Carter, also testified. Ms. Bordelon stated that she knew Miss White from seeing her walk back and forth to school, and that she did not see Miss White go to school or come home on April 22, 2016. Ms. Bordelon also testified that while she did not know defendant, when he came to her house looking for Miss White, she recalled that defendant seemed nervous. Ms. Bordelon testified that on the night in question, she went outside at 2:00 A.M. and noticed defendant was cleaning his trunk with a white cloth, which he threw in the garbage can when he was finished and went inside. Ms. Carter testified that at approximately 2:20 or 2:30 A.M. on April 22, 2018, she heard the slamming of doors or car trunk. She also recalled that Ms. Bordelon came to her door and told her that between 2:00 and 2:30 a.m., her neighbor was wiping something out of the trunk and that "he" threw "it" in the garbage can. Ms. Carter noted that there was mud on defendant's Cadillac.

5

Miss White's best friend, Nicole Celestine, testified that they rode the bus and went to school together, but that Miss White was not on the bus the day she went missing. Ms. Celestine also testified that Miss White was very careful with her appearance, would never leave the house with rollers in her hair, and would never run away from home.

A neighbor and good friend of Ms. Price's, Katrice Reid, testified that she went to Ms. Price [sic] residence when she found out Miss White was missing. Ms. Reid noted that defendant was "nonchalant" and made it seem that it was not a "big deal" that Miss White was missing. She recalled that defendant let her know that there was a possibility that Miss White would never be found and that Miss White was "well hidden" by now. She also recalled that when they were in the front room with other individuals around, defendant grabbed her by the arm, took her to the bedroom and asked, "If this goes bad, will you be there to take care of her?" Ms. Reid responded that of course she would, as Ms. Price was her best friend. Ms. Reid stated that a "red flag" went up when he asked her that. She asserted that defendant seemed like he was trying to deflect people from looking for Miss White, and that he made sure to point out that she was conversing with more than one boy.

Ms. Reid further testified that defendant said three different times that they would not find Miss White. She asked him why he kept saying that, and defendant replied, "because she bit off more than she could chew." When she asked what that meant, he said, "Whatever happened to her happened because she thought she was big and bad." Ms. Reid thought that defendant was confessing to her. Ms. Reid testified that later on, she saw the door being kicked in and that defendant was not trying to block it. She did not see defendant's wrists get injured trying to stop the crowd from coming in.[5]

Beckley proceeded to trial before a judge on October 10 through 13, 2017, and was found guilty as charged.[6] The trial court sentenced Beckley to life imprisonment at hard labor for the second degree murder conviction and imprisonment at hard labor for thirty years for the obstruction of justice conviction, each sentence to be served without benefit of parole, probation,

---

[5] *State v. Beckley*, 273 So. 3d 503, 506-10 (La. App. 5th Cir. 2019) (footnote omitted); St. R. Vol. 2 of 18, 5th Cir. Opinion, 18-KA-386, at 1-8, 5/8/19 (footnote omitted).

[6] St. R. Vol. 4 of 18 at 2-4, Trial Mins., 10/11/17; *id.* at 4-5, Trial Mins., 10/11/17; *id.* at 5-6, Trial Mins., 10/12/17; *id.* at 6, Trial Mins., 10/13/17; St. R. Vol. 5 of 18 at 81-216, Trial Tr., 10/10/17; *id.* at 217-302, Trial Tr., 10/11/17; St. R. Vol. 6 of 18 at 303-13, Trial Tr. (con't), 10/11/17; *id.* at 314-507, Trial Tr., 10/12/17; *id.* at 508-69, Trial Tr., 10/13/17.

or suspension of sentence and to be served consecutively.[7]  Beckley's motion for reconsideration of sentence was denied on March 1, 2018.[8]

On direct appeal, Beckley's appointed counsel asserted three assignments of error: (1) insufficient evidence supported his convictions; (2) the trial court erred in denying his motion for new trial; and (3) the trial court erred in denying Beckley's motion for post-verdict judgment of acquittal.[9]  Beckley filed a pro se brief in which he claimed that missing transcripts from December 13, 2016, January 18, 2017, March 8, 2017, April 19, 2017, and September 17, 2017 hearings made it impossible for his case to be properly reviewed.[10]

On May 8, 2019, the Louisiana Fifth Circuit Court of Appeal affirmed Beckley's convictions and sentences.[11]  The court determined that there was sufficient evidence to support his convictions, and that the trial court did not err in denying the motions for new trial and post-verdict judgment of acquittal.[12]  The court found that Beckley failed to show why the requested transcripts were relevant to any assignment of error.[13]  On December 10, 2019, the Louisiana Supreme Court denied Beckley's related writ application without reasons.[14]

On January 12, 2021, Beckley filed a pro se application for post-conviction relief asserting the following twenty-nine claims:[15]

(1) no evidence was presented to prove a homicide occurred;

---

[7] Vol. 4 of 18 at 7, Sentencing Mins., 12/12/17; St. R. Vol. 6 of 18 at 570-78, Sentencing Tr., 12/12/17.

[8] *Id.* at 7, Hearing Mins., 3/1/18; *id.* at 26-28, Motion for Reconsideration of Sentence, 1/4/18; St. R. Vol. 6 of 18 at 579-85, Hearing Tr., 3/1/18.

[9] St. R. Vol. 7 of 18, Appellate Brief, 18-KA-0386, 9/6/18.

[10] *Id.*, Pro Se Supplemental Brief, 18-KA-0386, 4/9/19.

[11] *State v. Beckley*, 273 So. 3d 503 (La. App. 5th Cir. 5/8/19); St. R. Vol. 2 of 18, 5th Cir. Opinion, 18-KA-386, 5/8/19.

[12] *Id.* at 510-13; St. R. Vol. 2 of 18, 5th Cir. Opinion, 18-KA-386, at 9-14, 5/8/19.

[13] *Id.* at 513-14; St. R. Vol. 2 of 18, 5th Cir. Opinion, 18-KA-386, at 14-16, 5/8/19.

[14] *State v. Beckley*, 285 So. 3d 490 (La. 12/10/19).; St. R. Vol. 11 of 18, La. Sup. Ct. Order, 2019-KO-01003, 12/10/19; *id.*, La. Sup. Ct. Writ Application, 19-KO-1003, 6/19/19 (signed 6/5/19).

[15] St. R. Vol. 3 of 18, Application for Post-Conviction Relief and Memorandum in Support, 1/14/21 (signed 12/30/20; served 1/6/21).

(2) no evidence was presented to satisfy the causation element of second degree murder;

(3) ineffective assistance of counsel in failing to request a *Daubert* hearing regarding the admissibility of the testimony of the pathology expert, Dr. Marianna Eserman;

(4) ineffective assistance of counsel in failing to call the coroner, Brian Brogle, to testify at trial;

(5) ineffective assistance of counsel in failing to move to suppress the DNA evidence;

(6) ineffective assistance of counsel in failing to object to the prosecution's alleged false statements regarding the disclosure of court ordered discovery material;

(7) ineffective assistance of counsel in failing to retain an expert in forensic pathology;

(8) ineffective assistance of counsel in failing to investigate and present an alibi defense;

(9) ineffective assistance of counsel in failing to move for a mistrial when the State purposely withheld discovery, and when Detective Dewhirst violated the sequestration order;

(10) ineffective assistance of counsel in failing to impeach Detective Dewhirst;

(11) the trial court erred in denying his request for a bill of particulars;

(12) the trial court erred in overruling the defense's objection to the death being declared a homicide;

(13) the trial court erred in denying the pro se motion to quash his arrest;

(14) the trial court erred in denying his motion to suppress the evidence from the search of the vehicle;

(15) excessive bail;

(16) the State committed a *Brady* violation by not disclosing prior to trial the police report prepared by Detective Savoie;

(17) ineffective assistance of appellate counsel in failing to raise on appeal the denial of the motion to quash his arrest;

(18) ineffective assistance of appellate counsel in failing to raise on appeal the denial of the motion for bill of particulars;

(19) ineffective assistance of appellate counsel in failing to raise on appeal a claim of lack of jurisdiction;

(20) ineffective assistance of appellate counsel in failing to raise on appeal the trial court's alleged error in overruling the defense's objection to death being called a homicide;

(21) ineffective assistance of appellate counsel in failing to raise on appeal that the $1,000,000 bond was excessive;

(22) ineffective assistance of appellate counsel in failing to raise on appeal a claim of excessive sentence;

(23) ineffective assistance of appellate counsel based on an incomplete appellate record;

(24) ineffective assistance of appellate counsel in failing to raise on appeal nonwaiver of the right to a jury trial;

(25) ineffective assistance of appellate counsel in failing to raise on appeal the trial court's denial of motion to suppress evidence seized from his vehicle;

(26) ineffective assistance of appellate counsel in failing to raise on appeal denial of his right of confrontation of Dr. Brogle;

(27) ineffective assistance of appellate counsel in failing to raise on appeal a claim of prosecutorial misconduct based on the failure to disclose a digital audio recording of his "re-interview;"

(28) ineffective assistance of appellate counsel in failing to raise on appeal a *Brady* claim related to the State's failure to timely disclose Detective Savoie's police report; and

(29) denial of a complete record on appeal.

On April 20, 2021, the trial court denied Beckley's application for post-conviction relief.[16] The trial court found that claims one and two were procedurally barred pursuant to LA. CODE CRIM. PROC. art. 930.4(A).[17] The trial court denied claims three through ten and found that Beckley failed to show that he received ineffective assistance of trial counsel.[18] The trial court found that claims eleven through fourteen were barred pursuant to LA. CODE CRIM. PROC. art.

---

[16] St. R. Vol. 9 of 18, Ruling on Application for Post-Conviction Relief, 4/20/21.
[17] *Id.* at 2.
[18] *Id.*

930.4(A) as they had been previously considered on appeal.[19] As for Beckley's claims raised in claims fifteen and twenty-one related to excessive bond, the trial court found the issues were moot.[20] The trial court found that there was no merit to Beckley's *Brady* claim.[21] The trial court rejected claims seventeen through twenty-eight, finding that Beckley failed to show any of the claims would have had merit had they been raised on appeal or any resulting prejudice.[22] Finally, the trial court found Beckley's claim relating to the completeness of the appellate record had been previously addressed.[23]

On July 5, 2021, Beckley filed a writ application to the Louisiana Fifth Circuit Court of Appeal.[24] On October 27, 2021, that court denied Beckley's writ application and noted that Beckley failed to meet his burden of proof under LA. CODE CRIM. PROC. art. 930.2[25] and the claims relating to the sufficiency of evidence were fully litigated on direct appeal.[26] With respect to Beckley's claims of ineffective assistance of trial counsel, the court found he failed to demonstrate that his counsel's performance was deficient or any resulting prejudice.[27] Specifically, with regard to the failure to file a *Daubert* motion, the court found that it was a matter of trial strategy and similar opinion evidence had been found admissible.[28] The court rejected claim seven relating to the failure to obtain an expert witness in forensic pathology, finding that Beckley failed to show how such an expert would have assisted in his defense or that the expert

---

[19] *Id.* at 2-3.
[20] *Id.* at 3.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] St. R. Vol. 14 of 18, 5th Cir. Writ Application, 21-KH-453, 7/9/21 (dated 7/5/21; postmarked 7/7/21).
[25] St. R. Vol. 14 of 18, La. App. 5th Cir. Order at 1, 21-453, 10/27/21.
[26] *Id.* at 2.
[27] *Id.* at 2-3, 6.
[28] *Id.* at 3.

would have rendered any opinion different than Dr. Eserman.[29]  The court rejected Beckley's claim relating to the failure to subpoena Dr. Brogle, finding that he was not the only source of the information and that there was no evidence that his testimony would have been favorable to the defense.[30]  The court found that the DNA evidence was relevant to whether Beckley was involved in the murder of the victim, and that defense counsel thoroughly questioned the DNA expert.[31] The court found that the trial court did not err in denying Beckley's claim alleging ineffective assistance of counsel relating to the evidence of the "re-interview" as the record demonstrated that Beckley had access to the audio and viewed the videos.[32]  The court rejected Beckley's claim of ineffective assistance of counsel for failure to investigate his alibi, finding that the victim died prior to April 24, 2016, and there was evidence showing Beckley's vehicle on April 22, 2016 near the area where the victim's body was found.[33]  The court found that Beckley failed to show that his counsel's failure to request a mistrial rose to the level of deficient performance.[34]  It found that defense counsel in fact questioned Detective Dewhirst regarding inconsistences in his statements, and that the trial judge who was the trier of fact, also presided over the motion to suppress hearing and was aware of any inconsistencies.[35]

The court found that Beckley's claims eleven though sixteen were not raised on appeal and were therefore procedurally barred pursuant to LA. CODE CRIM. PROC. art 930.4(C).[36]  The court noted that, contrary to Beckley's contention, the transcript of the motion to suppress hearing was

---

[29] *Id.* at 3-4.
[30] *Id.* at 4.
[31] *Id.*
[32] *Id.*
[33] *Id.* at 5.
[34] *Id.*
[35] *Id.* at 5-6.
[36] *Id.* at 7.

included in the appellate record as were all the motions and minute entries containing the trial court's rulings.[37]

The court rejected each of Beckley's ineffective assistance of appellate counsel claims.[38] The court found that appellate counsel was not ineffective for failing to raise on appeal the denial of the motion to quash his arrest because Detective Dewhirst's statements in his affidavit in support of Beckley's arrest were not inconsistent with the trial testimony.[39]  The court reasoned that, while Beckley claimed he never saw a written transcript of his "re-interview," he did not claim that he never viewed the video with audio of the interview.[40]  It additionally found that Detective Dewhirst explained that the time stamps of the surveillance cameras were off and were adjusted by comparing the time that the videos were collected with the time stamps.[41]  The court found that appellate counsel did not err in failing to raise on appeal the denial of the motion for bill of particulars as the State provided the defense with open file discovery.[42]  The court found that appellate counsel was not ineffective in failing to raise a claim relating to jurisdiction or venue on appeal.[43] And the evidence supported the pathologist's opinion that the victim's death was a homicide.[44]  The court rejected Beckley's claim of ineffective assistance of appellate counsel for failing to raise a claim of excessive bail, finding that bail became moot upon his conviction.[45]  The court reasoned that the trial court did not err in denying the claim relating to excessive sentence

---

[37] *Id.*
[38] *Id.* at 7-10.
[39] *Id.* at 8.
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*

because the life sentence was mandated.[46]  The court found that the supplemental appellate record included Beckley's written jury trial waiver as well as the transcript of the colloquy and that he had not shown relief would have been granted had appellate counsel raised a claim that Beckley did not waive his right to a jury trial.[47]  The court determined that appellate counsel was not ineffective in failing to raise an issue regarding the denial of the motion to suppress as the search of the vehicle did not occur until after a search warrant for the vehicle had been issued.[48]

The court concluded that claims twenty-six and twenty-seven lacked merit.[49]  It found that the prosecutors were not in possession of Detective Savoie's report prior to trial, that the report did not include any new information, and that Beckley was not prejudiced by the late disclosure and therefore, denied claim twenty-eight.[50]  Finally, the court rejected claims twenty-three and twenty-nine, finding again that Beckley failed to provide valid reasons why he needed additional transcripts and that the interests of justice did not require re-litigation of the issue of the appellate record or that appellate counsel was ineffective for failing to request additional transcripts.[51]

On March 15, 2022, the Louisiana Supreme Court denied Beckley's writ application.[52] The Court found that Beckley failed to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*,[53] failed to show that the state withheld material exculpatory evidence in violation of *Brady v. Maryland*,[54] and failed to meet his post-conviction

---

[46] *Id.* at 8-9.

[47] *Id.* at 9-10.

[48] *Id.* at 10.

[49] *Id.*

[50] *Id.*

[51] *Id.* at 9.

[52] *Beckley*, 333 So. 3d at 1237; St. R. Vol. 18 of 18, La. Sup. Ct. Order, 2021-KH-01987, 3/15/22.

[53] 466 U.S. 668 (1984).

[54] 373 U.S. 83 (1963).

burden of proof and/or the claims were repetitive pursuant to LA. CODE CRIM. PROC. arts. 930.2 and 930.4.[55]

## II.  <u>FEDERAL HABEAS PETITION</u>

On March 31, 2022, Beckley filed a petition for federal habeas corpus relief styled under 28 U.S.C. § 2254 and challenged his current custody.[56]  Beckley asserts the following claims:

(1) there was no evidence that a homicide occurred;

(2) there was no evidence to satisfy the causation element of second degree murder;

(3) ineffective assistance of counsel for failure to request a *Daubert* hearing to challenge the homicide declaration;

(4) ineffective assistance of counsel for failure to subpoena Dr. Brogle to testify at trial;

(5) ineffective assistance of counsel for failure to object or bring to the trial court's attention alleged prosecutorial misconduct;

(6) ineffective assistance of counsel for failure to enlist in the services of an expert in pathology and toxicology;

(7) ineffective assistance of counsel for failure to investigate, give notice, and present an alibi defense;

(8) ineffective assistance of counsel for failure to request a mistrial based on the late disclosure of the Kenner Police Department report and violation of the sequestration order;

(9) ineffective assistance of counsel for failure to impeach Detective Dewhirst's testimony;

(10) the trial court erred in denying his motion for a bill of particulars;

(11) the trial court erred in overruling the defense's objection to the victim's death being referred to as a homicide;

(12) the trial court erred in denying the defense's motion to quash his arrest;

---

[55] *Beckley*, 333 So. 3d at 1237; St. R. Vol. 18 of 18, La. Sup. Ct. Order, 2021-KH-01987, 3/15/22.
[56] ECF No. 4.

(13) the trial court erred in denying the motion to suppress items seized from Beckley's vehicle;

(14) the trial court erred in issuing an excessive bond;

(15) the State violated *Brady* by failing to disclose the Kenner Police Report prior to trial;

(16) ineffective assistance of appellate counsel for failure to raise on appeal the trial court's denial of the motion to quash;

(17) ineffective assistance of appellate counsel for failure to raise on appeal the trial court's denial of the motion for a bill of particulars;

(18) ineffective assistance of appellate counsel for failure to raise on appeal lack of jurisdiction;

(19) ineffective assistance of appellate counsel for failure to raise on appeal that the trial court erred in overruling the defense's objection to declaring the victim's death a homicide;

(20) ineffective assistance of appellate counsel for failure to raise on appeal a claim of excessive bail;

(21) ineffective assistance of appellate counsel for failure to raise on appeal a claim of excessive sentence;

(22) ineffective assistance of appellate counsel for failure to investigate a complete record;

(23) ineffective assistance of appellate counsel for failure to raise on appeal a claim that Beckley did not waive his right to a jury trial;

(24) ineffective assistance of appellate counsel for failure to raise on appeal that the trial court erred in denying the motion to suppress the evidence found in his vehicle;

(25) ineffective assistance of appellate counsel for failure to raise on appeal a claim that Beckley's right to confrontation was violated when Dr. Brogle did not testify at trial;

(26) ineffective assistance of appellate counsel for failure to raise on appeal a claim of prosecutorial misconduct;

(27) ineffective assistance of appellate counsel for failure to raise a *Brady* violation;

(28) the incomplete appellate record denied him a meaningful appeal.[57]

The State filed an initial response in opposition to Beckley's petition and asserted that Beckley failed to exhaust claims three through nine and fifteen through twenty-seven.[58]  The State claimed that Beckley failed to seek further review after the trial court denied his application for post-conviction relief.[59]  Beckley filed a traverse and argued that he exhausted each of his claims and addressed the merits of each.[60]

On October 13, 2022, this court ordered the State to supplement its response regarding the failure to exhaust claims and to submit a certified copy of additional records.[61]  On October 19, 2022, the State filed a supplemental answer in which it conceded that claims three through nine and sixteen through twenty-seven were in fact exhausted.[62]  The State asserts that claims ten through thirteen and fifteen are, however, procedurally barred[63] And the remaining claims are meritless.[64]

Beckley filed a reply to the State's supplemental response.[65]  Beckley claims that he was not able to raise claims ten through fourteen on direct appeal because he did not have the transcripts of the related hearings.[66]  He also asserts that the Louisiana Supreme Court did not procedurally bar his *Brady* claim.[67]

---

[57] ECF No. 1, at 4, 5; ECF No. 1-1, at 4-13.
[58] ECF No. 13, at 2-3; ECF No. 13-1, at 16-19.
[59] ECF No. 13, at 2; ECF No. 13-1, at 16-19.
[60] ECF No. 14.
[61] ECF No. 15.
[62] ECF Nos. 16, 16-1.
[63] ECF No. 16-1, at 20.
[64] *Id.* at 12-23.
[65] ECF No. 17.
[66] *Id.* at 4-5.
[67] *Id.* at 5-6.

## III.    LAW AND ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996,[68] and applies to habeas petitions filed after that date.[69]  The AEDPA therefore applies to Beckley's petition filed on March 31, 2022.[70]

### A.    Preliminary Considerations

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether petitioner's claims were adjudicated on the merits in state court.  In other words, has the petitioner exhausted state court remedies and is the petitioner in "procedural default" on a claim.[71]  The State asserts, and the record reflects, that Beckley's federal petition was timely filed under the AEDPA.  The State, however, contends that claims ten through thirteen and fifteen were procedurally barred from review by the state courts.[72]

### 1.    Procedural Default of Claims Ten through Fourteen

The State argues that that the state courts imposed a procedural bar under LA. CODE CRIM. PROC. art. 930.4(C) to claims ten through thirteen and fifteen, referencing that Louisiana Fifth Circuit decision finding that the trial court was precluded from considering the claims on post-

---

[68] The AEDPA was signed into law on that date and did not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 (5th Cir. 1992).

[69] *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).

[70] The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting *pro se*. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  Beckley dated his signature March 31, 2022.  ECF No. 4, at 58.

[71] *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

[72] ECF No. 16-1, at 20.

conviction relief.  As noted by Beckley, the Louisiana Supreme Court denied his *Brady* claim on the merits.[73]  The record, however, demonstrates that the state courts applied a procedural bar to claims ten through fourteen.

While the State's response does not rely on the procedural bar imposed on claim fourteen, it has not expressly waived procedural default as a defense.  The United States Fifth Circuit has held that, when there is no express waiver, the district court may, in its discretion, address the affirmative defenses *sua sponte*.[74]  When the court exercises its discretion to do so *sua sponte*, it must assure that the petitioner has notice that the issue is being considered.[75]  Therefore, the court hereby gives Beckley express notice that the court is also considering procedural default as to his claim fourteen.[76]  Beckley is further hereby specifically instructed that this report and recommendation is notice to him that this court is *sua sponte* raising the issue of procedural default as to claim fourteen and that petitioner must submit any evidence or argument concerning the default as part of any objections he may file to this report.[77]

A federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment.[78]  This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review.[79]  Procedural default does not bar federal court review of a federal

---

[73] *See Beckley,* 333 So. 3d at 1237; St. R. Vol. 18 of 18, La. Sup. Ct. Order, 2021-KH-01987, 3/15/22.

[74] *Prieto v. Quarterman*, 456 F.3d 511, 518 (5th Cir. 2006) (citing *Magouirk*, 144 F.3d at 360) (addressing procedural default); *Day v. McDonough*, 547 U.S. 198, 209-10 (2006) (addressing limitations).

[75] *Fisher v. Texas*, 169 F.3d 295, 301 (5th Cir. 1999); *Magouirk*, 144 F.3d at 358.

[76] *Fisher*, 169 F.3d at 301; *Magouirk*, 144 F.3d at 358.

[77] *Magouirk*, 144 F.3d at 348.

[78] *Cone v. Bell*, 556 U.S. 499, 465 (2009) (citing *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991)); *Ramirez v. Stevens*, 641 F. App'x 312, 319 (5th Cir. 2016).

[79] *Lee v. Kemna*, 534 U.S. 362, 375 (2002).

claim in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar.[80]  Imposition of a procedural bar prevails to prevent federal court review over any alternative discussion of the merits of the claim by a state court.[81]  On federal habeas review, the court looks to the last reasoned opinion of the state courts to determine whether denial of relief was on the merits or based on state law procedural grounds.[82]

  a.  **State Court Rulings**

The Louisiana Fifth Circuit found as follows:

  ***Claims Arising from Alleged Pretrial Errors and Brady Violations Not Raised on Appeal - Claims 11 to 16***

   Relator next contends he is entitled to relief based on the trial court's alleged error in denying several of his pre-trial motions, including the denial of his request for a bill of particulars (Claim 11); overruling his objection to calling the death of the victim a homicide (Claim 12); denying his *pro se* motion to quash his arrest (Claim 13); denying his motion to suppress items seized from his vehicle (Claim 14); and setting an excessive bond (Claim 15).  These are all issues which relator raised in the trial court and failed to pursue on appeal.  Relator contends that they were not raised on appeal because all pretrial matters were heard under prior Case Nos. 16-263 and 16-468, and the transcripts from these proceedings were not included in the record.  Relator's representations regarding the record are not accurate.  First, the transcript from the hearing on the motion to suppress is included in the record.  Second, while this Court declined to grant relator's request to transcribe other proceedings from these prior cases as explained more fully below, relator's motions and the minute entries containing all of the trial court's rulings on these motions are contained in the appellate record.

   La. C. Cr. P. art. 930.4(C) provides that: "[i]f the application alleges a claim which the petitioner raised in the trial court and inexcusably failed to pursue on appeal, the court shall deny relief."  Accordingly, the trial court did not err in denying relief on these issues as they were not raised on appeal and the trial court was precluded from considering them as post-conviction claims.

---

[80] *Rhoades v. Davis*, 914 F.3d 357, 372 (5th Cir. 2019) (citing *Harris v. Reed*, 489 U.S. 255, 263 (1989)).

[81] *Id.*; *Robinson v. Louisiana*, 606 F. App'x 199, 204 (5th Cir. 2015) (citing *Woodfox v. Cain*, 609 F.3d 774, 796 (5th Cir. 2010)).

[82] *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("We hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale ... then presume that the unexplained decision adopted the same reasoning.")

> Further, in Claim 16, relator contends that the State committed a *Brady* violation by not disclosing the police report prepared by Detective Savoie prior to trial. For the same reasons above, the trial court properly denied this claim as it was not raised on appeal.[83]

Notably, the Louisiana Supreme Court found that Beckley "fails to show that the state withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)."[84] Thus, the Louisiana Supreme Court did *not* impose a procedural bar as to claim fifteen. The Louisiana Supreme Court, however, ultimately found the other issues "repetitive," citing LA CODE CRIM. PROC. art 930.4.[85]

Under § 2254 and the AEDPA, this court's review is limited to that last reasoned state court decision disposing of the claim, whether on the merits or by procedural bar,[86] and the procedural bar doctrine precludes this Court's independent review of Beckley's claims ten through fourteen via this habeas petition.[87] As the Louisiana Supreme Court did not apply a procedural bar to claim fifteen, the State's contention that claim fifteen is procedurally barred is rejected.

### b.    Independent and Adequate State Law Basis

For the state law procedural bar to prevent review by this federal habeas court, the bar must be both independent and adequate. A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar.[88] The state-law ground may be a substantive rule dispositive of the case or

---

[83] St. R. Vol. 14 of 18, La. 5th Cir. Order, 21-KH-453, at 7, 10/27/21 (footnote omitted).

[84] *Beckley*, 333 So. 3d at 1237; St. R. Vol. 18 of 18, La. S. Ct. Order, 2021-KH-01987, 3/15/22.

[85] *Id.*; St. R. Vol. 18 of 18, La. S. Ct. Order, 2021-KH-01987, 3/15/22.

[86] *Batchelor v. Cain*, 682 F. 3d 400, 405 (5th Cir. 2012) ("Under AEDPA, we review 'the last reasoned state court decision.' "); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991) (federal habeas court looks to the "last reasoned decision" of the state courts to determine if disposition was procedural).

[87] *Cone*, 556 U.S. at 465 (independent and adequate state court procedural bar prevents federal habeas review); *Rhoades*, 914 F.3d at 372 (same).

[88] *Rhoades*, 914 F.3d at 372; *Rogers v. Mississippi*, 555 F. App'x 407, 408 (5th Cir. 2014).

a procedural bar to adjudication of the claim on the merits.[89]  To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases.[90]  A state procedural rule "can be 'firmly established' and 'regularly followed,' - even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."[91]  However, a state procedural rule that is applied arbitrarily or in an unexpected manner may be considered inadequate to prevent federal review.[92]

On habeas review, state procedural rules enjoy a presumption of adequacy, and the burden is on the petitioner to demonstrate otherwise.[93]  It also is not the federal habeas court's province to disagree with the application of the bar or to correct state court errors.[94]  It is only to determine its adequacy.[95]  Thus, when state courts apply a procedural bar that has neither foundation in the record nor basis in state law, federal courts need not honor that bar.[96]  However, when a foundation and basis exist in the record, as they do in Beckley's case, the bar must stand.

### i.      LA. CODE CRIM PROC. art. 930.4

Beckley claims that the procedural default of his claims by the Louisiana Supreme Court is "null and void" because the claims were not fully litigated on direct appeal.[97]

---

[89] *Wainwright v. Sykes*, 433 U.S. 72, 81-82 (1977).

[90] *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 60 (2009)); *Rogers*, 555 F. App'x at 408; *see also Glover v. Cain*, 128 F.3d at 902 (To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases).

[91] *Beard*, 558 U.S. at 60-61.

[92] *Martin v. Maxey*, 98 F.3d 844, 847-48 (5th Cir. 1996); *Prihoda v. McCaughtry*, 910 F.2d 1379, 1383 (7th Cir. 1990).

[93] *Glover*, 128 F.3d at 902; *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999).

[94] *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) and *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

[95] *Lee v. Cain*, No. 03-2626, 2004 WL 2984274, at *1 n.2 (E.D. La. Dec. 6, 2004) (Vance, J.).

[96] *See e.g.*, *Davis v. Johnson*, No. 00CV684-Y, 2001 WL 611164, at *4 & n.10 (N.D. Tex. May 30, 2001); *Johnson v. Lensing*, No. 99-0005, 1999 WL 562728, at *4 (E.D. La. Dec. 5, 2011); *Poree v. Cain*, No. 97-1546, 1999 WL 518843, at *4 (E.D. La. Jul. 20, 1999).

[97] ECF No. 17 at 4-5.

In Beckley's case, the Louisiana Fifth Circuit clearly applied LA. CODE CRIM PROC. art. 930.4(C) to bar review of Beckley's tenth, eleventh, twelfth, thirteenth, and fourteenth claims. Under art. 930.4(C), "[i]f the application alleges a claim which the petitioner raised in the trial court and inexcusably failed to pursue on appeal, the court may deny relief." The Louisiana Supreme Court generally applied LA. CODE CRIM. PROC. art 930.4 to bar review of these claims. Consistent with the lower courts' rulings, pursuant to LA. CODE CRIM. PROC. art. 930.4(C), Beckley could not seek post-conviction relief for a claim that could have been asserted on direct appeal. Thus, the state court's ruling on Beckley's tenth through fourteenth claims was based on a Louisiana law setting forth the procedural requirements for preservation and presentation of claims on post-conviction review.[98] The court's state law based reason for dismissal of Beckley's claims were independent of federal law.

In addition, as federal courts have repeatedly recognized, the independent state law bar imposed under LA. CODE CRIM. PROC. art. 930.4(C) is regularly and evenly applied by the state courts in similar cases.[99] Likewise, in Beckley's case, the article 930.4(C) restriction is also adequate to bar this court's review of his tenth through fourteenth claims.

For the foregoing reasons, the state court imposed procedural bar under LA. CODE CRIM. PROC. art 930.4(C) is independent state law and, as applied, adequate to bar review of Beckley's tenth, eleventh, twelfth, thirteenth, and fourteenth federal habeas claims. Only if Beckley meets an exception to this rule could he be excused from the procedural bar.

---

[98] *See Rogers*, 555 F. App'x at 408 (state courts' clear reliance on state procedural rule is determinative of the issue).

[99] *See, e.g.*, *Coleman v. Cain*, No. 07-3655, 2014 WL 348541, at *11 (E.D. La. Jan. 31, 2014) (Milazzo, J.) (Article 930.4(B) & (C) are independent and adequate to bar federal habeas review); *Johnson v. Cain*, No. 12-0621, 2012 WL 5363327, at *4 (E.D. La. Oct. 30, 2012) (Lemelle, J.) (Article 930.4(C) is independent and adequate state procedural bar); *Perez v. Cain*, No. 12-1331, 2012 WL 4815611, at *1 (E.D. La. Oct. 10, 2012) (Barbier, J.) (same); *see also Bennett*, 41 F.3d at 1581 (Article 930.4 is an independent and adequate state procedural rule).

c.    **Cause and Prejudice**

A federal habeas petitioner may be excluded from the procedural default rule if he can show "cause" for his default *and* "prejudice attributed thereto."[100]  To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.[101]  The mere fact that a petitioner or his counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.[102]  The Supreme Court has declined to give a precise definition for the term "actual prejudice" and instead requires the reviewing court to impose due process considerations regarding the impact of the alleged error or default on the outcome of the proceeding.[103]

In this case, Beckley contends that he did not have a complete record to raise these issues on direct appeal.  He argues that the Louisiana Fifth Circuit denied his requests to expand the appellate record to include certain transcripts leaving him no other choice but to raise the claims on post-conviction relief once he had obtained copies of the transcripts.  Beckley fails to acknowledge, however, that the suppression hearing transcript was in fact included in the record on direct appeal.[104]  Beckley was provided with a copy of the appellant record and also granted time to file a supplemental brief.[105]  While he filed a supplemental brief, he did not include a claim relating to the denial of the motion to suppress.  He fails to provide any reason for failing to do so.

---

[100] *Gonzales v. Davis*, 924 F.3d 236, 241-42 (5th Cir. 2019) (citing *Coleman*, 501 U.S. at 750; *Harris*, 489 U.S. at 262).

[101] *Maples v. Thomas*, 565 U.S. 266, 280 (2012) ("Cause for a procedural default exists where something external to the petitioner, something that cannot fairly be attributed to him, impeded his efforts to comply with the State's procedural rule."); *Gonzales*, 924 F.3d at 242 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

[102] *Murray*, 477 U.S. at 486.

[103] *United States v. Frady*, 456 U.S. 152, 167-68 (1982) (citing *Wainwright,* 433 U.S. at 91).

[104] *See* St. R. Vol. 5 of 18 at 42-80, Hearing Tr., 10/2/17.

[105] St. R. Vol. 5 of 18, Notice of Appellate Record Transmissions, 18-KA-386, 9/14/18.

His claim that he did not have the transcript is not supported by the record, and does not provide cause for his failure to raise on appeal claim thirteen relating to the denial of the motion to suppress.

The record further demonstrates that trial counsel provided Beckley with *all* the transcripts in the defense case file.[106]  Further, appellate counsel also provided Beckley with "the majority of the transcripts connected with the case" prior to the due date of his supplemental brief.[107]  Thus, his claim that he could not raise issues ten through fourteen because he did not have a complete record of the trial court proceedings is rejected.

Beckley also asserts that his appellate counsel was ineffective in failing to raise on appeal issues related to the denial of the bill of particulars, the motion to quash his arrest, and the motion to suppress, as well as issues relating to excessive bond, and the overruling of his objection to the crime being declared a homicide.  Broadly construing his pleadings, this appears to express another cause for his failure to timely and properly assert the claims on appeal.  Beckley has exhausted state court review of this ineffective assistance of appellate counsel claims, and may rely on them as cause for his default.[108]  As discussed later in this report, however, Beckley has not established ineffective assistance under *Strickland*.  Where, as here, a petitioner's ineffective assistance of counsel claims are meritless, they do not establish cause to excuse a procedural default.[109]

---

[106] ECF No. 4-6, at 35, Letter, 5/17/18.

[107] ECF No. 17-3, at 2-3, Letter, 9/5/18.

[108] *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000) (holding that "ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim.  And we held in [*Murray*, 477 U.S. at 488-89] that the principles of comity and federalism that underlie our longstanding exhaustion doctrine—then as now codified in the federal habeas statute, see 28 U.S.C. §§ 2254(b), (c) - require that constitutional claim, like others, to be first raised in state court").

[109] *Romero v. Collins*, 961 F.2d 1181, 1183 (5th Cir. 1992); *Bella v. Cain*, No. 12-2323, 2015 WL 1311216, at *16 (E.D. La. Mar. 23, 2015); *Arita v. Cain*, No. 11-636, 2011 WL 4738666, at *11 (E.D. La. Aug. 25, 2011), *R. & R. adopted by* 2011 WL 4738658, at *1 (E.D. La. Oct. 6, 2011), *aff'd*, 500 F. App'x 352 (5th Cir. 2012).

Therefore, Beckley has established no cause, and the record reflects none, for the default that would excuse the procedural bar imposed by the Louisiana Supreme Court. The record does not support a finding that any factor external to the defense prevented Beckley or his counsel from raising the claims in a procedurally proper manner. The record also does not reflect any action or inaction on the part of the State which prevented him from doing so.

"If a petitioner fails to demonstrate cause, the court need not consider whether there is actual prejudice."[110] Although the court need not determine whether prejudice resulted, Beckley has not alleged and the record does not demonstrate any actual prejudice of the kind necessary to excuse his default.[111] Accordingly, Beckley's claims ten, eleven, twelve, thirteen, and fourteen are procedurally barred from review in this court.

### d.    Fundamental Miscarriage of Justice

Beckley may also avoid the procedural bar if a fundamental miscarriage of justice will occur if the merits of his claims are not reviewed.[112] To establish a fundamental miscarriage of justice, Beckley must provide this court with evidence that would support a "colorable showing of factual innocence."[113] He would have to establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to his guilt.[114] "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency."[115] When the petitioner has not adequately asserted his actual innocence,

---

[110] *Matchett v. Dretke*, 380 F.3d 844, 848-49 (5th Cir. 2004) (internal quotations omitted) (quoting *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Cir. 1997)); *Martin*, 98 F.3d at 849 (same).

[111] *Meanes v. Johnson*, 138 F.3d 1007, 1011 (5th Cir. 1998) (citing *Engle v. Isaac*, 456 U.S. 107, 134, n.43 (1982)).

[112] *Gonzales*, 924 F.3d at 241-42.

[113] *Murray v. Quarterman*, 243 F. App'x 51, 55 (5th Cir. 2007).

[114] *Id.* (citing *Bagwell v. Dretke*, 372 F.3d 748, 756 (5th Cir. 2004)); *see Nobles*, 127 F.3d at 423 n.33 (actual innocence requires a showing by clear and convincing evidence that, "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.").

[115] *Bousley v. United States*, 523 U.S. 614, 623-24 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339

25

his procedural default cannot be excused under the "fundamental miscarriage of justice" exception.[116]

Beckley has not made a colorable showing of actual innocence. He arguably asserts actual innocence by challenging the sufficiency of the evidence presented at trial. His sufficiency of the evidence claims, as explained in more detail later in this report, however, do not entitle him to relief. None of Beckley's arguments establish or raise doubt about his guilt that were not already considered by the trier of fact. Beckley has pointed to no evidence that would show his actual innocence of the crimes for which he was convicted.

In summary, Beckley has failed to establish cause or prejudice, or a fundamental miscarriage of justice, to overcome the procedural bars to review of these claims. For these reasons, Beckley's tenth through fourteenth claims should be dismissed with prejudice as procedurally barred.

### B.    Standards of a Merits Review of the Remaining Claims

Sections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of fact and law in federal habeas corpus proceedings.[117] Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"[118] The statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

---

(1992)).

[116] *Woodfox*, 609 F.3d at 793.

[117] *Nobles*, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

[118] *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1).  The determination receives deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"[119]  The United States Supreme Court has clarified the § 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.[120]

The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."[121]  "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"[122]

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case]

---

[119] *Penry v. Johnson*, 215 F.3d 504, 507 (5th Cir. 2000) (brackets in original) (quoting *Miller v. Johnson*, 200 F.3d 274, 280-81 (5th Cir. 2000)), *aff'd in part, rev'd in part on other grounds*, 532 U.S. 782 (2001); *Hill*, 210 F.3d at 485.
[120] *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *Penry*, 532 U.S. at 792-93 (2001) (citing *Williams*, 529 U.S. at 405-06, 407-08); *Hill*, 210 F.3d at 485.
[121] *White v. Woodall*, 572 U.S. 415, 427 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)); *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (quoting *Harrington*, 562 U.S. at 103).
[122] *White*, 572 U.S. at 426 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)); *Shoop*, 139 S. Ct. at 509 (habeas courts must rely "strictly on legal rules that were clearly established in the decisions of this Court at the relevant time.")

27

incorrectly.'"[123]   Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."[124]  The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.[125]

## IV.   BECKLEY'S SPECIFIC CLAIMS[126]

### A.   Claims One and Two:  Insufficient Evidence

Beckley alleges that there was no evidence to support the verdicts.  He claims that there was no evidence demonstrating that a murder happened or that it occurred in St. Charles Parish. He further argues that there is no evidence to satisfy the causation element of second degree murder.

The State responds that there was ample evidence to support the verdicts.  It argues that, given the DNA evidence, there is no reasonable way to believe that a person other than Beckley committed the crimes.

On direct appeal, Beckley raised three insufficiency of the evidence claims.  In the last reasoned opinion, the Louisiana Fifth Circuit found:

> Defendant argues that the evidence was insufficient to prove who killed the victim or that the killing was an intentional act as no cause of death was proven at trial.  He asserts that any number of people could have had bungee cords like the ones found at the crime scene, that the presence of hair curlers established nothing in terms of proving that he was the perpetrator.  He also maintains that the police did not definitively match the tire marks found on the crime scene to defendant's vehicle.

---

[123] *Price v. Vincent*, 538 U.S. 634, 641 (2003) (brackets in original) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (citations omitted)).

[124] *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).

[125] *Price*, 538 U.S. at 641 (*quoting Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).

[126] For ease of analysis, given the overlapping nature of some of Beckley's claims, they are discussed in a different order than listed in the petition.

Defendant asserts that it is difficult to believe that if he killed the victim at her home, put her body in the car, and dumped it on St. Rose Street, that he did so without leaving any trace of her blood anywhere or any evidence of what the murder weapon might have been. He also contends that even though the evidence suggested he had sexual contact with the victim before her death, it did not prove that if he did kill her, he did so deliberately. With respect to the obstruction of justice charge, defendant argues that there was no DNA that was connected to the victim found in his vehicle. For the foregoing reasons, defendant argues that because the evidence was insufficient to support the convictions, the trial court erred by denying the motions for post-verdict judgment of acquittal and for a new trial.

The State responds that the evidence was sufficient to support the convictions and that no testimony or other evidence supported the guilt of anyone other than defendant. It further responds that there was absolutely no reasonable hypothesis of innocence based on defendant's odd behavior, unrefuted statements, DNA results, tire tracks, and the video surveillance footage of his car being driven down St. Rose Avenue on the night of the murder. Therefore, the State argues that the trial judge acted reasonably in finding that there was no valid explanation for defendant's actions and statements that would support his innocence. The State also asserts that all of the evidence points to the killing being intentional, and that no evidence supported a conclusion that the killing was accidental or unintentional.

The constitutional standard for testing the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the Jackson standard, a review of a criminal conviction record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the reviewing court is required to consider the whole record and determine whether any rational trier of fact could have found guilt beyond a reasonable doubt. State v. Jones, 08-20 (La. App. 5 Cir. 4/15/08), 985 So.2d 234, 240.

La R.S. 14:30.1 defines second degree murder, in pertinent part, as the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Specific criminal intent, as a state of mind, need not be proven as fact but may be inferred from the circumstances and the actions of the accused. State v. Martinez, 09-740 (La. App. 5 Cir. 3/23/10), 38 So.3d 926, 932.

Defendant was also convicted of obstruction of justice. La. R.S. 14:130.1 provides that the crime of obstruction of justice, when committed with the knowledge that such act may affect a criminal proceeding, includes "[t]ampering

with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding." This provision further states that "[t]ampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance" at the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any law enforcement investigation.

Although the evidence was primarily circumstantial, based on the following, we find the evidence was sufficient under the <u>Jackson</u> standard to support the convictions of second degree murder and obstruction of justice. The evidence showed that the victim was last seen by defendant at home on April 22, 2016, at approximately 2:45 A.M. Dr. Eserman testified that the cause of death was homicidal violence of unknown means and that the manner of death was homicide. The DNA results indicated that defendant had engaged in sexual activity with the victim, although defendant denied that he did so. There was evidence that defendant had marks on his wrists, and Dr. Eserman testified that these marks could be consistent with fingernail scratches.

In addition, the State presented evidence that tire marks went off the road where the body was found and then back onto the road, that the tire marks were wide and not made by a typical vehicle, that defendant had wide tires on his vehicle, and that the measurements of defendant's tires were very similar to the tire impressions at the St. Rose crime scene. Mr. Troxler, the crime scene technician, recovered a green bungee cord with a missing black cap, which he located near the ditch in close proximity to the body. Mr. Troxler located a black cap inside of defendant's trunk which Detective Dewhirst suspected was the missing cap for the bungee cord found at the St. Rose crime scene. In addition, the box of bungee cords found in the kitchen drawer of defendant's residence was supposed to contain several different colors, including green, but that the box was missing all of the green bungee cords.

Furthermore, Detective Dewhirst testified regarding the surveillance footage from several locations around Kenner and St. Rose on April 22, 2016. This surveillance showed defendant's vehicle turning around at 12:13 A.M. and parking by the side door of his residence. Approximately twelve minutes later, defendant's vehicle traveled a route towards the crime scene on St. Rose Avenue, specifically, down Phoenix Street, took a left onto 27th Street, took a right onto Bessemer Street, passed in front of Hollywood Laundry, crossed over Veterans Boulevard, took the Loyola Drive exit to I-310, passed in front of 720 St. Rose Avenue, turned around, came back to where the "dump site" was, and returned to his home from those same locations. The video also showed defendant stopping at the Discount Zone, opening the trunk, and manipulating something white. On April 29, 2016, Detective Dewhirst conducted a test run using defendant's vehicle, noting that the still photographs of the surveillance footage on April 22 and April 29 showed that they were the same vehicle.

Ms. Price testified that she last saw the victim alive on the night of April 21, 2016, before she went to work. When she got home from work on April 22, 2016, between 8:00 and 8:30 a.m., she noticed that there was a lot of dirt and mud on the floor by the side door. The victim was not at home then, which was routine since she would have gone to school by then. Ms. Price later found the victim's missing school uniform hidden in defendant's tote bag, and the victim's house key hidden in defendant's watch box. Ms. Price noticed that some large white towels were missing from her bathroom.

Several witnesses testified regarding defendant's odd behavior. Ms. Collins testified that defendant took her aside and told her they were not going to find the victim. Ms. Bordelon testified that she went outside at 2:00 A.M. on April 22, 2016, and saw defendant cleaning his trunk with a white cloth, after which he threw the cloth into the garbage can and went inside. Ms. Carter asserted that at approximately 2:20 or 2:30 A.M. on April 22, 2016, she heard the slamming of doors or car trunks. She recalled Ms. Bordelon coming to her door and telling her that defendant was wiping the trunk of his vehicle, after which he threw the cloth into the garbage can. Ms. Reid testified that defendant was "nonchalant" about finding the victim and told her that there was a possibility that she would never be found, and that she was "well hidden" by now. She thought it odd when defendant took her to the bedroom and asked if she would be there for Ms. Price "if this goes bad." Ms. Reid also recalled that defendant kept saying they would not find the victim "because she bit off more than she could chew" and "whatever happened to her happened because she thought she was big and bad," which Ms. Reid interpreted as a confession. Further, Ms. Reid did not see defendant's wrists get injured when people were trying to get into the house. This testimony, along with Dr. Eserman's, undermines defendant's claim that the scratches on his wrists were inflicted by the people trying to get into his house, and not by the victim.

Viewing the evidence in a light most favorable to the State, we find that a rational trier of fact could have concluded that defendant committed the second degree murder of the victim, and that every reasonable hypothesis of innocence was excluded. The evidence showed that defendant had the specific intent to kill the victim or to inflict great bodily harm upon her and that he tampered with the evidence with the specific intent of distorting the results of a criminal investigation. Accordingly, we also find that a rational trier of fact could have concluded that defendant committed the crime of obstruction of justice. Considering the foregoing, we further find that the trial court did not err by denying the motion for new trial and the motion for post-verdict judgment of acquittal. These assignments of error lack merit.[127]

---

[127] *Beckley*, 273 So. 3d at 510-13 (footnotes omitted); St. R. Vol. St. R. Vol. 2 of 18, 5th Cir. Opinion, 18-KA-386, at 9-14, 5/8/19 (footnotes omitted).

Beckley sought review of the Louisiana Fifth Circuit decision, and the Louisiana Supreme Court denied writs without reasons.[128]

Initially, Beckley asserts that his claims are "no evidence claims" and not sufficiency of the evidence claims. He relies on the "no evidence" rule in *Thompson v. City of Louisville* in which the Supreme Court held that a conviction was unconstitutional if the charges were totally devoid of evidentiary support.[129] In *Jackson v. Virginia*, however, the Supreme Court found *Thompson*'s "no evidence" standard, which required that a conviction supported by any evidence of guilt, was "simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt."[130] The Court abandoned the "no evidence" standard, which was more favorable to the prosecution, and adopted the "sufficiency of the evidence" formulation.[131]

A federal habeas court addressing an insufficiency of the evidence claim must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.[132] As the Supreme Court explained:

> [T]his inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[133]

---

[128] *Beckley*, 333 So. 3d at 1237; St. R. Vol.18 of 18, La. Sup. Ct. Order, 2021-KH-01987, 3/15/22.
[129] 362 U.S. 199, 206 (1960).
[130] *Jackson v. Virginia*, 443 U.S. 307, 320 (1979).
[131] *Id.* at 318.
[132] *Id.* at 319; *Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir. 2011); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008).
[133] *Id.* at 319 (emphasis in original) (internal quotation marks and citations omitted).

Moreover, because the state court's decision applying the already deferential *Jackson* standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."[134]

To determine whether commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law.[135]  The court's consideration of the sufficiency of the evidence extends only to what was presented at trial.[136]  A federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder.[137]  Thus, review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury.[138]  All credibility choices and conflicting inferences must be resolved in favor of the verdict.[139]  Again, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'"[140]  Further, although Beckley claims no direct evidence supports his convictions, the fact that most of the evidence was circumstantial does not change the standard of review.[141]

---

[134] *Parker v. Matthews*, 567 U.S. 37, 43 (2012); *see also Coleman*, 566 U.S. at 651.

[135] *Perez*, 529 F.3d at 594 (citing *Jackson*, 443 U. S. at 324 n.16).

[136] *See McDaniel v. Brown*, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court must consider the trial evidence as a whole under *Jackson*); *Johnson v. Cain*, 347 F. App'x 89, 91 (5th Cir. 2009) (*Jackson* standard relies "upon the record evidence adduced at the trial.") (quoting *Jackson*, 443 U.S. at 324).

[137] *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985).

[138] *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

[139] *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005).

[140] *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)).

[141] *United States v. Zuniga-Salinas,* 945 F.2d 1302, 1305 (5th Cir. 1991).

A claim of insufficient evidence presents a mixed question of law and fact.[142]  Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

Beckley was charged with and convicted of second degree murder and obstruction of justice.  Second degree murder is defined in relevant part by Louisiana law as "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm."[143]

Obstruction of justice is defined in pertinent part as follows:

A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:

(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding.  Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:

(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers; or

(b) At the location of storage, transfer, or place of review of any such evidence.[144]

Obstruction of justice is also a specific intent crime.[145]  Thus, to support a conviction, the State must have proved beyond a reasonable doubt that Beckley "intentionally altered, moved, or removed evidence from a location he had reason to know would be the subject of investigation, with the specific intent of distorting the investigation's results."[146]

---

[142] *Perez*, 529 F.3d at 594; *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995).

[143] LA. REV. STAT. § 14:30.1(A)(1).

[144] LA. REV. STAT § 14:130.1.

[145] *State v. Manuel*, 337 So. 3d 967, 974 (La. App. 4th Cir. 2022)

[146] *State v. Harvey*, 345 So. 3d 1043, 1049-50 (La. App. 4th Cir. 5/25/22), *writ denied*, 346 So. 3d 803 (La. 9/20/22).

The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act."[147] Under Louisiana law, intent need not be proven directly, but may be inferred from the actions of the defendant and the circumstances surrounding those actions.[148] The fact that a defendant attempts to cover up the death of a victim by attempting to convince the police that he was not involved is sufficient evidence for the trier of fact to conclude the defendant had specific intent to kill the victim.[149]

Beckley claims that there was no evidence that the victim's death was the result of a homicide. He claims that that the cause of death was never determined and that there was no evidence that any violence occurred or that it occurred in St. Charles Parish. Beckley does not specifically address his obstruction of justice conviction.

At trial, the State presented the testimony of Officer Gabriel Marquez Castro who met with Michelle Price and Beckley when they reported the victim missing.[150] Officer Castro recalled that Beckley asked to speak with him outside of Price's presence.[151] Beckley, who appeared to be nervous and looked like he wanted to cry, told Castro that the victim associated with drug dealers in the Lincoln Manor area.[152]

---

[147] LA. REV. STAT. § 14:10(1).
[148] *State v. Sharlhorne*, 554 So. 2d 1317, 1321 (La. App. 1st Cir. 12/19/89); *State v. Tate*, 851 So. 2d 921, 930 (La. 5/20/03) (citing *State v. Brooks*, 505 So. 2d 714, 717 (La. 4/6/87)).
[149] *State v. Vail*, 236 So. 3d 644, 669 (La. 12/28/17) (where cause of death could not be determined as to whether it was death, strangulation, suffocation or a blow to the head, the fact that defendant attempted to convince the police that the victim accidentally fell overboard was sufficient evidence for the jury to conclude that he had specific intent to kill her).
[150] St. R. Vol. 5 of 18 at 109, Trial Tr., 10/10/17.
[151] *Id.*
[152] *Id.* at 109, 111.

35

Detective Aaron Savoie of the Kenner Police Department testified that he secured a search warrant for the residence.[153]  Detective Savoie explained that, while he was meeting with Detective Dewhirst, he received a call that approximately 150 people were trying to break into the victim's residence.[154]  When he arrived at the residence, the street was filled with people and people were claiming that Beckley had killed the victim.[155]

Rene Peneguy testified that, on April 24, 2016, she was driving with her family on St. Rose Avenue when she saw a body in a ditch.[156]  She called 911 and the Sheriff's Office responded.[157]  She recalled that investigators measured the tires on her husband's vehicle.[158]  Peneguy explained that her husband did not drive in the grassy area by the ditch.[159]

Barry Minnich, chief investigator of the St. Charles Parish Coroner's Office, testified that, after an autopsy, the victim's cause of death was determined to be homicidal violence of unknown means.[160]

The trial court also heard the testimony of Dr. Eserman, the deputy coroner for Jefferson Parish, who performed an autopsy of the victim.[161]  Dr. Eserman determined the victim's manner of death was homicidal violence by unknown means and the cause of death to be homicide.[162]  Dr. Eserman explained that the victim's body was so badly decomposed that she could not determine the specific injury that caused her death.[163]  Dr. Eserman, however, was certain that the death was

---

[153] *Id.* at 113.
[154] *Id.* at 114, 122.
[155] *Id.* at 114.
[156] *Id.* at 136.
[157] *Id.* at 136-37.
[158] *Id.* at 137.
[159] *Id.* at 139-40.
[160] *Id.* at 151, 154.
[161] *Id.* at 221.
[162] *Id.* at 224, 225.
[163] *Id.* at 223-224.

a homicide and explained her reasons for concluding that homicide was the cause of death as follows: "a 16-year-old should not be found nude on the side of the road due to natural or accidental means.  There was no evidence that there was any drugs in her system to explain for the death.  There was no other natural diseases that we found in her to explain for her death.  Therefore, by process of elimination, it appears to be a homicide."[164]  She explained that her determination that it was a homicide was based not just on the evidence presented to her, but her examination of the victim, and reiterated that she examined the victims organs and found no natural diseases.[165]  Dr. Eserman explained that she excluded drowning a cause of death as the victim was not found floating in a body of water and as "there were no indications why she would have been in that canal unless it was somebody who put her there."[166]  She further explained that the victim's respiratory system did not indicate that she drowned.[167]  There was no evidence of injuries to her head or of an aneurysm.[168]  Due to the poor condition of the victim's body, Dr. Eserman could not rule out strangulation of suffocation.[169]  Dr. Eserman testified that the marks on Beckley's wrists could be consistent with fingernail scratches.[170]

Elizabeth Hamilton, a forensic DNA analyst for the Louisiana State Police Crime Lab, testified as forensic DNA expert.[171]  She generated reports from samples from a sexual assault kit of the victim, a buccal swab of Beckley, a sheet from the victim's bedroom, blood from the victim's bedrail, jeans found in Beckley's trunk, material from the seat of his car, and a bungee cord.[172]

---

[164] *Id.* at 226.
[165] *Id.*
[166] *Id.* at 227, 233.
[167] *Id.* at 233.
[168] *Id.* at 227-29.
[169] *Id.* at 230-33.
[170] *Id.* at 224.
[171] *Id.* at 234.
[172] *Id.* at 235-36, 249-50.

The sexual assault kit was presumptively positive for seminal fluid on the cervical, external genitalia, perineal, anal, and oral swabs of the victim.[173]   The blood on the bedrail was a mixture of two contributors, with the victim unable to be excluded as the major contributor.[174]   A valid DNA profile could not be obtained for the minor contributor.[175]   The DNA profile obtained from multiple stains of suspected blood on the jeans was consistent with Beckley's DNA profile.[176]   The DNA profile obtained from the bungee cord was consistent with being a mixture of DNA from at least two individuals, but no conclusions could be made regarding the inclusion or exclusion of any contributor.[177]   Beckley and the victim could not be excluded as contributors to the DNA profiles obtained from a sperm fraction of a cervical swab of the victim.[178]   Similarly, Beckley and the victim could not be excluded as contributors to the DNA profile obtained from the sperm fraction of perineal and anal swabs of the victim.[179]   The DNA profile obtained from a fingernail swab of the victim's right hand was consistent with a mixture of DNA of two individuals.[180]   The victim could not be excluded as the major contributor to the profile, but a valid DNA profile could not be obtained for the minor contributor.[181]

Detective Dewhirst testified that he responded to the scene of an investigation on St. Rose Avenue and found the victim nude in a ditch with pink curlers in her hair and a green one near the scene.[182]   Detective Dewhirst noted wide tire tracks, not made by a typical car tire, in a grassy area

---

[173] *Id.* at 254.
[174] *Id.* at 237-38, 250.
[175] *Id.* at 238.
[176] *Id.* at 238, 251.
[177] *Id.* at 238-39, 251-52.
[178] *Id.* at 240, 242.
[179] *Id.* at 241-42.
[180] *Id.* at 241-42.
[181] *Id.* at 242.
[182] *Id.* at 257-58.

leading to the ditch that went off road to where the body was found and then back onto the road.[183] A green bungee cord missing a rubber cap was found next to the waterline near the victim's body.[184]  The victim was identified through dental records.[185]  Due to a disturbance outside of the victim's home which caused an unsafe environment, Price and Beckley were transported to police headquarters to be interviewed.[186]

Detective Dewhirst first interviewed Tara Collins.[187]  Collins told him that Beckley believed that the victim's death "was the cause of her messing around with all these boys," and that Collins felt that, prior to the discovery of the victim's body, Beckley had been trying to undermine everything they were trying to do to locate the victim.[188]  Collins believed that Beckley had a sexual relationship with the victim and that she was dead because she may have been pregnant.[189]

Michelle Price told Dewhirst that, when she arrived home from work the morning the victim went missing, she noticed that the victim's fan and television were left on, which was unusual.[190]  When Dewhirst inquired about the existence of any bungee cords, Price told him that they had purchased some bungee cords for a recent move.[191]  Price initially believed that the victim had gone missing after she went to school as she noticed that her daughter's school uniform, black jacket, and white sneakers were missing.[192]

---

[183] *Id.* at 258-59.
[184] *Id.* at 259, 280.
[185] *Id.* at 261.
[186] *Id.* at 261-63.
[187] *Id.* at 263.
[188] *Id.*
[189] *Id.* at 266.
[190] *Id.* at 264.
[191] *Id.*
[192] *Id.* at 266.

Detective Dewhirst then conducted a video interview of Beckley, which was played for the trial court.[193]  Beckley claimed that he awoke a little after 1:00 a.m. on April 22, 2016, and drove to Discount Zone to get gas and air for his tires.[194]  He returned to the house and dressed for work.[195]  After leaving for work, he realized he forgot his cell phone and returned home to retrieve it.[196]  Beckley claimed that the victim was in the bathroom, and that he told her he was leaving for work, and she responded.[197]  Beckley denied having any sexual relationship with the victim.[198]  Beckley claimed that he did not know where Price hid the victim's house key.[199]

Dewhirst testified that Beckley accused the victim of having sexual relations with three or four boys and said, "What are you not getting from me?"[200]  Beckley stated that the victim had "slipped back into doing some of the things she had been doing."[201]  He speculated that the victim set up some boys to get beat up and that her death was retaliatory.[202]  Beckley told Dewhirst that he hoped the victim had "changed her mind and she tried to fight him off and she went down swinging."[203]  After Dewhirst accused Beckley of murdering the victim, Beckley laid on the floor and went to sleep for several hours.[204]  When the interview resumed, Beckley claimed the scratches on his wrist were from people attempting to break into the house.[205]

---

[193] *Id.* at 266-273.
[194] St. R. Vol. 8 of 18, Transcribed Statement of Beckley, at 7-8, 4/25/16.
[195] *Id.* at 8-9.
[196] *Id.* at 9-10.
[197] *Id.* at 9.
[198] *Id.* at 15-17
[199] *Id.* at 22.
[200] St. R. Vol. 5 of 18 at 270, Trial Tr., 10/11/17.
[201] *Id.*
[202] *Id.* at 271.
[203] *Id.*
[204] *Id.* at 271-72.
[205] *Id.* at 273.

A search of the victim's room pursuant to a warrant revealed a bag of green rod rollers, but the pink rollers were missing.[206]  A multi-pack box of similarly designed bungee cords with the same warning tags as the bungee cord found near the victim's body was found in the kitchen drawer.[207]  The box was missing its two green bungee cords.[208]

Dewhirst obtained a search warrant for Beckley's Cadillac Deville, which had wide tires.[209]  Dewhirst compared the size of the tires on Beckley's car with the measurements found at the St. Rose Avenue scene and found that they were very similar.[210]  A pair of blue jeans and a black rubber cap, suspected to be the missing bungee cord cap, were located in the trunk of Beckley's vehicle.[211]

Dewhirst explained that, after meeting with the pathologist and coroner, the police changed the classification of the investigation from an unclassified death to a death by homicidal violence.[212]  Thereafter, Dewhirst contacted Price who told him she had not had contact with Beckley since the victim's body was found.[213]  Dewhirst also determined that, based on the results of the sexual assault kit, Beckley had lied about having no sexual contact with the victim.[214]

Dewhirst and other detectives working the investigation collected surveillance footage from various locations around Kenner and St. Rose Avenue.[215]  After piecing together the footage, the police were able to determine the route Beckley's car traveled on the morning on April 22,

---

[206] *Id.* at 283.
[207] *Id.* at 283-85.
[208] *Id.* at 285.
[209] *Id.* at 285, 287.
[210] *Id.* at 287.
[211] *Id.* at 287-88.
[212] *Id.* at 288.
[213] *Id.*
[214] *Id.* at 289.
[215] *Id.* at 289-90.

2016.[216]  The surveillance footage was shown to the trial judge.[217]  The footage showed, at 12:13 a.m., Beckley's vehicle backed out of his yard and then backed into the driveway and park by the side door.[218]  Twelve minutes later, Beckley's vehicle traveled away from his house and made a left on 27th Avenue.[219]  Video surveillance from 12:35 a.m. showed Beckley's vehicle pass in front of 720 St. Rose Avenue, turn around in the tree lines, and head back towards the "dump site."[220]  Video surveillance from Discount Zone showed Beckley, who was wearing jeans and a green shirt, pull his vehicle in at 12:57 a.m., and manipulate something white in his trunk.[221]  Video surveillance next showed Beckley return home at 1:05 a.m., and pull straight into the driveway.[222]  Finally, the video surveillance showed Beckley leave his home again at 2:30 a.m., return for a minute, and leave again at 2:33 a.m.[223]  Detective Dewhirst testified that, based on surveillance footage, they believe that Beckley took the victim from the house, placed her in the car the morning of April 22, 2016, drove to the location on St. Rose Avenue where the victim's body was found, dumped her body, and returned home.[224]  Dewhirst conducted a test run of the same route using Beckley's vehicle and finished about five minutes faster.[225]

In the following weeks, Price called Dewhirst on several occasions.[226]  On one occasion, she told him she found the victim's missing house key in Beckley's watch box.[227]  On another

---

[216] *Id.* at 290-301.

[217] *Id.* at 291-301.

[218] *Id.* at 293-94.

[219] *Id.* at 294.

[220] *Id.* at 297-98.

[221] *Id.* at 298-99.

[222] *Id.* at 300.

[223] *Id.* at 300-01,

[224] St. R. Vol. 6 of 18 at 304, Trial Tr.(con't) 10/11/17.

[225] *Id.* at 305-07.

[226] *Id.* at 307-08.

[227] *Id.* at 308.

occasion, she told him she realized that several white towels were missing from the bathroom, and that she had found the victim's missing school uniform in between Beckley's clothes stored in a rubber tote.[228]  She also told Dewhirst that she recalled that when she got home from work the morning the victim went missing, there was mud in the house by the side door.[229]

Michelle Price testified that she last saw the victim the night of April 21, 2016, at which time she was in the house with Beckley.[230]  When Price returned home the following morning, she noticed a lot of dirt on the floor near the side door and the kitchen sink and that the victim's television and fan were on in her room.[231]  About 6:45 p.m., she received a phone call from one of the victim's friends asking about the victim's whereabouts.[232]  When Price told Beckley that the victim was missing, he quickly hopped up and said, "let's go to the police station."[233]  Price testified that the victim had too many hope and dreams to run away, and would have never left the house with curlers in her hair.[234]  After they filed a missing person report and returned home, Beckley acted nervous and "zoomed" into the house.[235]  Price realized that the victim's school uniform was missing.[236]  Price, however, confirmed that the victim was not amongst the students walking to the bus stop in an April 22, 2016 surveillance video.[237]  Later, she found the victim's house key in Beckley's watch box, and the missing school uniform in a tote full of Beckley's clothes.[238]  Price recalled that, when a crowd attempted to knock down their door, Beckley held

---

[228] *Id.*
[229] *Id.*
[230] St. R. Vol. 6 of 18 at 384-85, Trial Tr., 10/12/17.
[231] *Id.* at 385, 400-01.
[232] *Id.* at 386.
[233] *Id.*
[234] *Id.* at 387, 392.
[235] *Id.* at 387-88.
[236] *Id.* at 388.
[237] *Id.* at 396.
[238] *Id.* at 388-90.

his back to the door to try to prevent anyone from entering.[239]  Price also recalled that she told police there were bungee cords in the kitchen drawer.[240]  She also later realized large white towels were missing.[241]

Tara Collins, the victim's cousin, testified that she went to the house to help after she learned that the victim was missing.[242]  At some point, Beckley brought her into the house and showed her the victim's cell phone and read her some texts.[243]  Collins recalled that Beckley told her that they were not going to find the victim.[244]  Later that day, Collins suggested that they walk the neighborhood to look for cameras, but Beckley did not want to do that.[245]

Debbie Bordelon, a neighbor, met Beckley the day he came to her house looking for the victim.[246]  He looked nervous and did not look her in the eye.[247]  Bordelon testified that she was outside at 2:00 a.m. one morning, and witnessed Beckley cleaning his trunk with a white rag, and then saw him place something white in the garbage can.[248]

Nicole Celestine, the victim's best friend, testified that the victim was very aware of her appearance and would never voluntarily leave the house with rollers in her hair.[249]  Celestine recalled that the victim was not on the bus the day she went missing, and that she did not see her at school.[250]  Celestine did not believe that the victim would run away from home.[251]

---

[239] *Id.* at 392-93.
[240] *Id.* at 393-94.
[241] *Id.* at 395-96.
[242] *Id.* at 416, 421.
[243] *Id.* at 418-19, 421.
[244] *Id.* at 419.
[245] *Id.*
[246] *Id.* at 425.
[247] *Id.* at 425, 437.
[248] *Id.* at 426-29.
[249] *Id.* at 442.
[250] *Id.*
[251] *Id.* at 444.

Patricia Carter, a neighbor, recalled that between 2:00 and 2:30 in the morning on either April 22 or 23, 2016, she heard noise that sounded like the slamming of car doors or trunks.[252] Carter testified that she watched the neighborhood students walk to and from school daily.[253] She recalled that, on the evening of April 22, 2016, Beckley came to her house searching for the victim.[254] She then realized that she had not seen the victim come home from school.[255] Beckley told Carter that he saw the victim early in the morning, that she was in the shower, and that he knocked on the bathroom door and went to work.[256] On Saturday morning, another neighbor, Debbie Bordelon told Carter that she saw Beckley wiping something out of his trunk and throwing it in the garbage can.[257] Carter noticed mud on Beckley's car.[258]

Katrice Reid went to the victim's home after she learned that the victim was missing.[259] According to Reid, Beckley acted nonchalant and claimed that the victim ran away.[260] Reid opined that Beckley seemed to be more concerned with making sure that others were aware of the type of things the victim had been involved in previously.[261] She recalled that he pulled out the victim's cell phone and told them that the victim was conversing with boys.[262] Beckley told Reid that the victim would never be found and that she was well hidden.[263] He also said that whatever happened to her was because she thought she was big and bad and had bitten off more than she could chew.[264]

---

[252] *Id.* at 457, 471.
[253] *Id.* at 451.
[254] *Id.* at 452, 462-63, 465.
[255] *Id.* at 452, 461.
[256] *Id.* at 454, 467.
[257] *Id.* at 458-59, 475-76.
[258] *Id.* at 459-60, 472-74.
[259] *Id.* at 479, 492.
[260] *Id.* at 480, 485-86.
[261] *Id.* at 481.
[262] *Id.* at 481-82.
[263] *Id.* at 480-81, 484.
[264] *Id.* at 484.

At some point, Beckley pulled Reid aside and asked, referring to Price, "if this goes bad, will you be there to take care of her?  Will you look out for her?"[265]  Reid felt as if Beckley was confessing to her and was acknowledging that he was not going to be around.[266]  Reid recalled that, after it was confirmed that the victim's body was found, Beckley acted very nervous.[267]

Although Beckley claims there was no evidence that the victim was murdered, the State presented witness testimony that the victim's cause of death was due to homicidal violence.  To the extent that Beckley disagrees with the evidence, his arguments go to the weight and credibility of the evidence.  Challenges to the accuracy of witness testimony go to credibility, which is a matter left to the judgment of the trier of fact, and a reviewing court cannot reevaluate that credibility determination.[268]  A federal habeas court generally will not grant relief on an insufficient evidence claim premised on credibility issues.[269]

Further, a state court's decision denying a claim on the merits is considered "unreasonable" only when it runs afoul of the law as set forth by the United States Supreme Court.  If the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."[270]

---

[265] *Id.* at 481.

[266] *Id.* at 484, 493.

[267] *Id.* at 489-90, 496.

[268] *State v. Thomas*, 13 So. 3d 603, 607 (La. App. 5th Cir. 2008); *see also Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981) (that the jury chose to believe a witness whose credibility was challenged is not a question of constitutional dimensions); *Holderfield v. Jones*, 903 F. Supp. 1011, 1018 (E.D. La. 1985) (habeas courts should defer to the jury's credibility determinations and justifiable inferences of fact.) (citing *United States v. Hatch*, 926 F.2d 387, 399 (5th Cir. 1991)).

[269] *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."); *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); *McCowin v. Scott*, No. 93-5340, 24 F.3d 240, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); *Phillips v. Cain*, No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), *R.&R. adopted*, 2012 WL 2565025 (E.D. La. July 2, 2012); *Picou v. Cain*, No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

[270] *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

Here, Beckley has not identified – and this Court's independent research has not uncovered – a United States Supreme Court case with evidence analogous to that presented in the instant case in which the Supreme Court determined that the *Jackson* standard was unmet.

In summary, viewing the evidence in the light most favorable to the prosecution in accordance with *Jackson*, the State presented sufficient evidence for a reasonable trier of fact to conclude that each element of second degree murder and obstruction of justice was established. Therefore, the state courts' denial of relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent. Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

### B.    Claim 15:  *Brady* Violation

Beckley claims that the State committed a *Brady* violation by not turning over a Kenner Police Report authored by Detective Savoie prior to trial. He contends that the police report establishes that his vehicle was seized from his home before a search warrant was issued in violation of the Fourth Amendment. He further contends that, had the report been disclosed prior to the suppression hearing, he would have been able to prove that the vehicle was seized without a warrant, and that the evidence found in the vehicle would have been suppressed.

The State responds that the prosecution was not in possession of the report prior to the trial commencing. It further argues that the report did not include any new information.

In denying relief as to this issue, the Louisiana Supreme Court, citing *Brady v. Maryland*,[271] found that Beckley failed to show that the State withheld material exculpatory evidence.[272]

---

[271] 373 U.S. 83 (1963).
[272] *Beckley*, 333 So. 3d at 1237; St. R. Vol. 18 of 18, La. S. Ct. Order, 2021-KH-01987, 3/15/22.

The United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[273] The duty to disclose this kind of evidence exists even though there has been no request by the defendant.[274]  The prosecution's duty to disclose includes both exculpatory and impeachment evidence.[275]  *Brady* claims involve "the discovery, *after trial* of information which had been known to the prosecution but unknown to the defense."[276]  To prove a *Brady* violation, Beckley must establish that the evidence is favorable to the accused as exculpatory or impeachment, that the evidence was suppressed by the State, and that prejudice resulted from the non-disclosure.[277]

Because this claim was denied on the merits in state court, this court's role is limited to deciding "whether the state court's *Brady* determination resulted in a decision that [was] contrary to, or involved an unreasonable application of, clearly established federal law."[278]

Detective Savoie, the second witness for the State, testified on cross-examination that he did not forward his report to the St. Charles Parish Sheriff's Office because the report had not yet been checked for grammatical errors or approved by his sergeant at the time of trial.[279]  Savoie testified that the information in his report was no different from his trial testimony.[280]  The trial

---

[273] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[274] *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *Hall v. Thaler*, 504 F. App'x 269, 273 (5th Cir. 2012) (citing *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

[275] *Strickler*, 527 U.S. at 280 (citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); *United States v. Valas*, 822 F.3d 228, 236-37 (5th Cir. 2016).

[276] *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) (quoting *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392) (emphasis added); *accord Reed v. Stephens*, 739 F.3d 753, 783 (5th Cir. 2014).

[277] *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler*, 527 U.S. at 281-82, 119 S.Ct. 1936); *Reed*, 739 F.3d at 782.

[278] *Dickson v. Quarterman*, 462 F.3d 470, 477-78 (5th Cir. 2006).

[279] St. R. Vol. 5 of 18 at 130-31, Trial Tr., 10/10/17.

[280] *Id.* at 133.

court ordered Detective Savoie to produce the report.[281]   After the lunch recess, the defense recalled Detective Savoie who testified that he received the report from his superior with grammatical changes, but that no changes were made in the context and narrative.[282]   The report was admitted into evidence.[283]

The report provides information of the investigation from approximately 9:22 p.m. on April 24, 2016, when Detective Savoie first met with Detective Dewhirst until April 26, 2016, when the Kenner Police Department investigation was administratively closed due to St. Charles Sheriff's Office leading the investigation into the victim's death.[284]   According to the report, a search warrant for the residence was obtained and executed at 0037 hours on April 25, 2016, and concluded at 0301 hours.[285]   Detective Savoie's last involvement with the investigation occurred on April 26, 2016, after which he requested the Kenner Police Department investigation be administratively closed as the St. Charles Sheriff's Office was leading the investigation.[286]

The record establishes that the State received possession of the Kenner Police Report on the first day of trial.   A copy of the report was given to the defense.   Thus, no information was withheld in violation of *Brady*.   "[W]hen information is fully available to a defendant at the time of trial . . . the defendant has no *Brady* claim."[287]

---

[281] *Id.* at 134.

[282] *Id.* at 147.

[283] *Id.*

[284] St. R. Vol. 8 of 18, Kenner Police Department Report, 10/10/17.

[285] *Id.* at 3-4.

[286] *Id.* at 5.

[287] *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980); *see also Smith v. Travis*, No. 08-4627, 2009 WL 1704335, at *10 (E.D. La. June 16, 2009) ("Where, as here, the evidence at issue came to light during trial in sufficient time for defense counsel to put it to effective use, it was not 'suppressed' in violation of *Brady* and its progeny.").

Where, as here, the disclosure is late, there is no violation of *Brady*.[288]  Rather, the test for late disclosure of evidence is "whether the defendant was prejudiced by the tardy disclosure."[289] "If the defendant received the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might have and, indeed, should have been."[290]

The defense was given an opportunity to recall Detective Savoie after reviewing the report, and introduced the report into evidence.[291]  Further, defense counsel was in possession of the report for two days prior to his cross-examination of Detective Dewhirst, and could have utilized the report to impeach him.[292]

Beckley does not explain how the late disclosure of the report prevented him from effectively using the information in it at trial.  Denial of relief on this issue was not contrary to or an unreasonable application of federal law.

To the extent that Beckley claims that the late disclosure of the report prevented him from using it at the suppression hearing, that claim also does not warrant federal habeas corpus relief. *Brady* did not involve a suppression hearing, and there is no Supreme Court precedent holding that *Brady* applies in pretrial suppression hearings.  As a result, there is no basis for finding that the state court decision denying the claim "was contrary to, or involved an unreasonable application of, *clearly established Federal law, as determined by the Supreme Court of the United States.*"[293] The law is clear that when there is no Supreme Court precedent to control a legal issue raised by a

---

[288] *United States v. Chesser*, 795 F. App'x 242, 244 (5th Cir, 2019) (disclosure of a memorandum of interview after the government rested its case did not violate *Brady*).

[289] *United States v. Swenson*, 894 F. App'x 677, 683 (5th Cir. 2018) (citation omitted).

[290] *Id.* (citation omitted).

[291] St. R. Vol. 5 of 18 at 147-48, Trial Tr., 10/10/17.

[292] St. R. Vol. 6 of 18 at 319-500, Trial Tr., 10/12/17.

[293] 28 U.S.C. § 2254(d)(1) (emphasis added).

habeas petitioner, the Louisiana Supreme Court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law, and no federal habeas relief is warranted.[294]

Accordingly, the denial of relief on this issue by the Louisiana Supreme Court was not contrary to, or an unreasonable application of, Supreme Court law. Beckley is not entitled to federal habeas corpus relief as to this issue.

C.      **Claim 28:  Denial of a Meaningful Appeal**

Beckley contends that he was denied a meaningful appeal based on an incomplete appellate record. He claims that all transcripts from the original cases were purposely omitted from the appellate record. He specifically points to a transcript from the December 13, 2016 motion hearing at which Dr. Eserman and Detective Dewhirst testified. He also points to hearings on January 18, 2017, March 8, 2017, April 19, 2017, August 28, 2017, September 6, 2017, and September 17, 2017, although he does not explain the significance of those hearings.

The State responds that Beckley's claim is baseless. It further asserts that Beckley fails to establish how the alleged missing transcripts would have had any impact on the ultimate outcome of his appeal.

In the last reasoned opinion on direct appeal, the Louisiana Fifth Circuit found:

In his *pro se* brief, defendant contends that his United States Fourteenth Amendment due process rights, his Sixth Amendment effective assistance of

---

[294] *See Woods v. Donald*, 575 U.S. 312, 317 (2015) (citing *Lopez v. Smith*, --- U.S. ----, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014)) (per curiam) ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be "contrary to" any holding from this Court."*); Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law."); *Higginbotham v. Louisiana*, 817 F.3d 217 (5th Cir. 2016) (No violation of clearly established law where "the Supreme Court does not appear to have addressed this issue or a 'materially indistinguishable' set of facts"); *Gomez v. Thaler*, 526 F. App'x 355, 359-60 (5th Cir. 2013) (citing *Van Patten*, 552 U.S. at 126) (When no Supreme Court precedent directly addressed the presented issue, it could not be said that the state court unreasonably applied clearly established federal law.).

counsel rights, and his right to judicial review of a felony conviction under Louisiana Constitution, Article 1, Section 19, have been denied because the Twenty-Ninth Judicial District Court has not provided to him all of the transcripts of court proceedings for case numbers 16-0263 and 16-0468. Defendant claims that several transcripts have been purposefully omitted from the appellate record by the Twenty-Ninth Judicial District Court. Defendant asserts the lack of these transcripts makes it impossible for this Court to properly review any and all assignments of error that he will make and for this Court to review any errors patent that may exist. Defendant argues that his appellate counsel, who was not his trial counsel, could not and did not have the opportunity to perform his/her mandated duty to represent him because of the missing transcripts. Based on the foregoing, defendant argues that this Court should reverse his convictions, vacate his sentences, and remand the matter for a new trial.

La. C.Cr.P. art. 914.1 states as follows:

A. The party making the motion for appeal shall, at the time the motion is made, request the transcript of that portion of the proceedings necessary, in light of the assignment of errors to be urged. Not later than five days after the motion, the opposing party may designate in writing the transcript of that portion or portions of the proceedings necessary to oppose the appeal.

B. A transcript of any portion of the proceedings which does not relate to anticipated assignment of errors shall not be furnished to a party for purposes of appeal and shall not result in delay of preparation of the appeal record.

C. (1) An attorney who requests a transcript in accordance with this Article must certify there are good grounds for such request in light of the assignment of errors to be urged.

* * *

D. The trial court or the appellate court may designate additional portions of the transcript of the proceedings which it feels are necessary for full and fair review of the assignment of errors.

The party making the motion for appeal bears the burden of furnishing the appellate court with a record of the trial proceedings needed for review; and therefore, any inadequacy of the record is imputable to the appellant. State v. Ronquille, 09-81 (La. App. 5 Cir. 5/26/09), 16 So.3d 411, 416, writ denied, 09-1397 (La. 2/5/10), 27 So.3d 298; State v. Shaw, 00-1051 (La. App. 5 Cir. 2/14/01), 785 So.2d 34, 42, writ denied, 01-0969 (La. 2/8/02), 807 So.2d 861. An appellate court renders its judgment based upon the record filed on appeal; thus, if transcripts,

52

exhibits, or other documentation are missing and the appellant fails to act, there is no basis for the appellate court to determine that the trial court erred.  Id.

Neither defendant nor the State have requested or designated any additional transcripts in compliance with La. C.Cr.P. art. 914.1A.  Moreover, the record does not indicate that defendant requested any transcript at the conclusion of any hearings which he claims are missing, or that the hearings from which he claims the transcripts were purposefully omitted were ever transcribed for any reason.  Although the record contains minimal hearing transcripts from district court case nos. 16-0263 and 16-0468, there is nothing to show defense counsel or the State requested that other hearings from these case proceedings be transcribed and filed into these records.

In State v. Sharp, 35,714 (La. App. 2 Cir. 2/27/02), 810 So.2d 1179, 1194, writ denied, 02-1736 (La. 6/6/03), 845 So.2d 1081, defendant claimed that the record was incomplete because the voir dire transcript and the reading of the indictment were not furnished.  Defendant claimed he could not prepare his assignments of error without the transcript and requested that the appellate court order a complete copy of the transcript including the voir dire.  The appellate court declined, noting that the defendant is not entitled to supplement the record on appeal unless he showed that the requested record was related to specific assigned errors.  The appellate court found that neither the defendant nor his attorney assigned as error any issues involving the jury voir dire.  The appellate court noted that the defendant's generic allegations and his assertion that he needed the transcript to prepare his assignments of error amounted to a "fishing expedition" and was insufficient to require a supplementation of the record.  State v. Sharp, 810 So.2d at 1194.

Defendant has not indicated why the requested transcripts are relevant or set forth what errors the trial court allegedly made during those proceedings or hearings.  Neither defendant nor his attorney has alleged that these transcripts are relevant to any assignments of error, as required by La. C.Cr.P. art. 914.1.  As in Sharp, defendant's generic assertions that the lack of these transcripts makes a proper review of his appeal and "any and all assignment of error claims that will be made by Appellant" impossible amounts to a "fishing expedition," and such a generic claim is insufficient to support supplementation of the record.

Considering the foregoing, we find this assignment of error lacks merit.[295]

---

[295] *Beckley*, 273 So. 3d at 513-14 (footnotes omitted); St. R. Vol. 2 of 18, La. 5th Cir. Opinion, 18-366, at 14-16, (La. App. 5th Cir. 5/8/19) (footnotes omitted).  Beckley raised the issue again on collateral relief and it was found to be repetitive because it had already been asserted and adjudicated on direct appeal.  That procedural ruling is of no moment in this federal proceeding.  Because the claim had been previously denied on the merits on direct review, this court simply "looks through" that subsequent procedural ruling and evaluates the validity of the prior direct-review ruling.  *See Ylst*, 501 U.S. at 804 n.3.

It is indisputably true that a criminal defendant has the right to adequate appellate and other review of his conviction based upon a sufficiently complete record.[296]  However, the Supreme Court has not held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief.  The Fourteenth Amendment Due Process and Equal Protection Clauses only require states to provide indigent defendants with a trial transcript free of charge when it is necessary for meaningful appellate review.[297]  Notably, the states are not required to furnish complete transcripts "so that the defendants . . . may conduct 'fishing expeditions' to seek out possible errors at trial."[298]  To prevail on a claim that the record was inadequate, a petitioner must prove that he was actually prejudiced in his appeal because a transcript or portion thereof was missing.[299]

Beckley has made no showing of prejudice.  On the contrary, the record was wholly adequate for resolution of the claims that were actually asserted on appeal (*i.e.*, sufficiency of the evidence, and denial of his motions for post-verdict judgment or acquittal and new trial).  Where, as here, the missing pretrial transcripts were immaterial to the claims actually asserted on appeal, the record was adequate for full appellate review, and there was no denial of a meaningful appeal.[300]

---

[296] *Mayer v. City of Chicago*, 404 U .S. 189, 198 (1971).

[297] *See Griffin v. Illinois*, 351 U.S. 12, 19-20 (1956).

[298] *Jackson v. Estelle*, 672 F.2d 505, 506 (5th Cir. 1982).

[299] *Green v. Johnson*, 160 F.3d 1029, 1045 (5th Cir. 1998) ("[B]arring a showing that the [failure to record bench conferences during trial] resulted in 'actual prejudice,' habeas relief is unwarranted." (citation omitted)); *see also Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987) (finding petitioner failed to show the absence of voir dire transcript prejudiced his appeal); *Bozeman v. Cain*, No. 09-8423, 2010 WL 2977393, at *4 (E.D. La. June 7, 2010), *R.&.R. adopted*, 2010 WL 2977402 (E.D. La. July 20, 2010) (finding that petitioner's claim failed when there was no actual prejudice resulting from the failure to transcribe a bench conference).

[300] *See Schwander v. Blackburn*, 750 F.2d 494, 497-98 (5th Cir. 1985) (explaining that petitioner was not denied a meaningful appeal where the omitted portions of the trial transcript were immaterial to the error alleged on direct appeal); *Thomas v. Cain*, No. 12-2818, 2013 WL 5960808, at *5 (E.D. La. Nov. 6, 2013) (finding that the record was adequate for resolution of appellate claims).

54

Therefore, Beckley has not shown that the state courts' denial of relief on this claim was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.  He is not entitled to relief on this claim.

**D.**     **Claims Three Through Nine:  Ineffective Assistance of Trial Counsel**

Beckley next alleges multiple instances of ineffective assistance of trial counsel. Specifically, he asserts his trial counsel was ineffective in

- failing to request a *Daubert* hearing to challenge the testimony of Dr. Eserman;
- failing to subpoena the St. Charles Parish Coroner, Dr. Brian Brogle, to testify at trial;
- failing to object or bring to the trial court's attention the prosecution's alleged failure to turn over the audio recording of Beckley's "re-interview";
- failing to retain an expert in pathology and toxicology to aid in his defense;
- failing to investigate and present an alibi defense;
- failing to request a mistrial after learning that a police report had been withheld and the rule of sequestration violated; and
- failing to impeach Detective Dewhirst's testimony with information included in the police report.

**1.**     **State Court Rulings**

Beckley asserted each of these arguments in his application for post-conviction relief.  The trial court found that Beckley failed to show that he received ineffective assistance of trial and denied relief on the claims.[301]

The Louisiana Fifth Circuit denied the claims as follows:

**Ineffective Assistance of Trial Counsel - Claims 3 to 10**

Relator next argues that the trial court erred by denying his claims that he received ineffective assistance of counsel at trial.  Relator contends his trial counsel rendered ineffective assistance by failing to: challenge the admissibility of the testimony from the State's forensic pathologist, Dr. Marianna Eserman (Claim 3); call the coroner as a witness (Claim 4); file a motion to suppress the DNA evidence and expert testimony (Claim 5); object to the prosecution's alleged false statements regarding the disclosure of court ordered discovery material (Claim 6); call an expert in forensic pathology (Claim 7); investigate an alibi defense (Claim 8); file

---

[301] St. R. Vol. 9 of 18, Ruling on Application for Post-Conviction Relief, at 2, 4/20/21.

a motion for mistrial for withheld discovery and a violation of the sequestration order (Claim 9); and impeach Detective Joseph Dewhirst's testimony (Claim 10). The trial court denied these claims finding that relator failed to show he received ineffective assistance of counsel.

Under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution, a defendant is entitled to effective assistance of counsel. *State v. Casimer*, 12-678 (La. App 5 Cir. 3/13/13), 113 So.3d 1129, 1141. To prove ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Id.* Under the *Strickland* test, the defendant must show: (1) counsel's performance was deficient, that is, that the performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defense. *Id.* An error is considered prejudicial if it was so serious a to deprive the defendant of a fair trial, or "a trial whose result is reliable." *Id.* To prove prejudice, the defendant must demonstrate that, but for counsel's unprofessional conduct, the outcome of the trial would have been different. *Id.*

In order to prevail, the accused must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; specifically, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065. An alleged error that is within the ambit of trial strategy does not establish ineffective assistance of counsel because "opinions may differ on the advisability of such a tactic." *State v. Singleton*, 05-634 (La. App. 5 Cir. 2/14/06), 923 So.2d 803, 811, *writs denied*, 09-1208 (La. 11/17/06), 942 So.2d 532 and 08-2386 (La. 1/30/09), 999 So.2d 753. Based on the reasons set forth more fully below, we agree that relator failed to meet his burden to demonstrate that his trial counsel's performance was deficient or that his performance prejudiced the defense.

With respect to the State's forensic pathologist, Dr. Eserman, relator contends his trial counsel should have filed a *Daubert* motion to challenge her expert testimony because she could not identify the injury that caused the victim's death (Claim 3). Relator does not cite to jurisprudence in either his writ application or APCR that renders a pathologist's opinion inadmissible under similar circumstances. In fact, in *State v. Bunley*, 00-405 (La. App. 4 Cir. 12/12/01), 805 So.2d 292, *writ denied*, 02-505 (La. 1/24/03), 836 So.2d 41, the court found that a forensic pathologist's opinion that the death was a homicide as opposed to the result of natural causes was admissible, even though pathologist determined the specific cause through a process of exclusion. Furthermore, an attorney's decision to stipulate to an expert's qualifications as opposed to requiring the trial court to hold a *Daubert* hearing has been found to be within the realm of trial strategy. *See State v. Johnson*, 99-11117 (La. App 4 Cir. 5/17/00), 764 So.2d 1113, 1121, *writs denied*, 00-2297 (La. 11/17/00), 774 So.2d 973 and 00-1827 (La. 6/29/01) 794 So.2d 822.

56

Our review of the trial transcripts provided by relator further indicates that his trial counsel conducted extensive cross-examination of Dr. Eserman regarding her inability to determine the exact cause of death.

In a related claim (Claim 7), relator argues his trial counsel was ineffective for failing to obtain an expert witness in forensic pathology to assist at trial. Relator, however, fails to explain how such an alleged expert would have assisted in his defense or that the expert would have rendered any opinions different tan Dr. Eserman.

Relator next argues that his trial counsel should have subpoenaed the St. Charles Parish coroner, Dr. Brain Brogle, to testify as a witness at trial because he possessed pivotal information that only the coroner could provide (Claim 4). Relator bases this claim, in part, on responses that the coroner's chief investigator, Barry Minnich, provided during cross-examination regarding how the coroner determined the death was a homicide and what the coroner viewed at the scene where the victim's body was found. Mr. Minnich responded to these questions by stating that counsel would have to ask the coroner, Dr. Brogle. Relator argues these responses establish that the coroner was a necessary witness for the defense. However, relator's arguments ignore Mr. Minnich's testimony explaining that Dr. Brogle relied on the forensic pathologist's findings from the autopsy in classifying the death as a homicide. Furthermore, the evidence included photographs Mr. Minnich took from the scene where the victim's remains were recovered. Accordingly, the coroner was not the only source of this information as alleged by relator.

Second, relator complains his counsel should have called Dr. Brogle based on a notation in one of the police reports which stated: "Let it be noted that the toxicology report revealed that [the victim] had a trace amount of Adderall in her system however Dr. Brogle advised that it was not enough to be the cause of death." Relator contends his counsel should have called Dr. Brogle to explain and challenge this determination. However, relator provides no evidence to suggest that Dr. Brogle's testimony would have been favorable to the defense and does not provide any evidence to contradict the statement in the police report. Further, the decision to call or not to call a particular witness is a matter of trial strategy and not, *per se*, evidence of ineffective assistance of counsel. *State v. Allen*, 06-778 (La. App. 5 Cir. 4/24/07), 955 So.2d 742, 751, *writ denied*, 08-2432 (La. 1/30/09), 999 So.2d 754.

In Claim 5, relator maintains that his trial counsel should have filed a motion to suppress the DNA evidence and related testimony on relevancy grounds because realtor was not charged with a sexual offense. At trial, the DNA results indicated there was a very high probability that seminal fluid found in the victim's cervical, perineal and anal areas belonged to realtor. At the time of the offense at issue, the victim was 16 years old and the daughter of relator's girlfriend of nine years. Further, relator was living in the same home as the victim and her mother. Evidence

57

of relator's sexual involvement with the victim, who was the minor child of his girlfriend, is certainly relevant to whether realtor was involved in the murder of the victim. Furthermore, counsel thoroughly questioned the State's DNA analyst about the reliability of the results during his cross-examination.

Relator next claims his trial counsel failed to object to or bring to the trial court's attention that the State lied about turning over audio for a "re-interview" of relator conducted by Detective Joseph Dewhirst of the St. Charles Parish Sheriff's Office (Claim 6). Our review of the record indicates that the trial court did not err in denying this claim as relator had access to the audio from all of his interviews when he was allowed to view the videos of his interviews with the St. Charles Parish Sheriff's Office.

In Claim 8, realtor claims ineffective assistance because his counsel failed to investigate his alibi defense. According to realtor, he was at church with the victim's mother on April 24, 2016, the same date indicated as the date of the victim's death on the autopsy report. However, Mr. Minnich testified that the date and time of death referred to in the pronouncement of death was based on the time they arrived at the scene where the victim's body was found, and not the date and time when the victim actually died, as relator suggests. Furthermore, surveillance footage showed relator's vehicle going to the area where the victim's body was located on the night before and early the following morning of the victim's disappearance on April 22, 2016.

Relator next claims that his counsel was ineffective because he did not request a mistrial on two grounds. Relator first alleges that his counsel should have requested a mistrial after Detective Aaron Savoie with the Kenner Police Department revealed his police report recounting his involvement in the investigation at issue was not previously provided to the State, relator of the St. Charles Parish Sheriff's Office (Claim 9). Relator also argues that Detective Dewhirst of the St. Charles Parish Sheriff's Office admitted he had a copy of Detective Savoie's report, but did not turn it over to the State or relator. During his testimony on the first day of trial, Detective Savoie admitted on cross-examination that his police report had not been produced because it was still under review with his supervisor. Our review of the record indicates that Detective Savoie was the second witness called during the judge trial and the trial court judge immediately ordered Detective Savoie to produce a copy of his report. Detective Savoie stated that the report did not contain any information that differed from his testimony. The record indicates that Detective Savoie produced his report shortly thereafter and was re-examined by both the State and defense counsel regarding the report. Our review of the report indicates that it was cumulative of Detective Savoie's trial testimony; thus, counsel may have made the strategic decision to forego the possibility of ending the case in a mistrial. Furthermore, we reviewed Detective Dewhirst's trial testimony and he did not state or admit he was in possession of Detective Savoie's report prior to the start of the trial. Rather, he merely indicated

that he read over the report after he confirmed he was aware that the Kenner Police Department released it earlier that week.

Relator also contends this counsel should have requested a mistrial because he claims Detective Dewhirst violated the sequestration order based on his testimony at trial indicating that he knew Detective Savoie reveled the existence of his police report on the first day at trial. As noted above, Detective Dewhirst was the lead investigator on the case and was likely consulted to determine if he was previously aware of the report after its existence was revealed on the first day of trial. We do not find that this rises to the level of deficient performance on behalf of trial counsel.

In Claim 10, relator contends his trial counsel was ineffective because he failed to impeach Detective Dewhirst's trial testimony with inconsistent statements and with information contained in Detective Savoie's police report. Relator first contends Detective Dewhirst testified on cross-examination at trial that he found the black rubber cap, suspected to be from the green bungee cord found at the crime scene, during a second search of relator's vehicle at 10:30 a.m. on April 26, 2016. At the suppression hearing conducted less than two weeks prior to the trial, Detective Dewhirst testified that Jason Troxler, a crime scene technician, located the rubber cap in the trunk of relator's car around 5:00 a.m. on April 25, 2016. Our review of the trial transcript indicates that trial counsel did question Detective Dewhirst regarding these inconsistences when he asked how the black cap appeared on the return from the first search, which listed a return time of 5:17 a.m. on April 25, 2016, when he testified at trial that he did not find the cap until the following day, April 26. In response, Detective Dewhirst explained that they started the search on April 25 and they did not create a new return when the search continued into the next day. He stated that when they found additional items on April 26 they placed them on the initial return dated April 25. We further note that because the trial judge was the trier of fact at trial, and he also presided over the hearing on the motion to suppress held shortly prior to trial, he was aware of any inconsistences when considering his verdict.

Relator also points to alleged inconsistencies in testimony from Detective Dewhirst regarding the reason they seized relator's vehicle from his home. He contends Detective Dewhirst testified at trial that they seized the vehicle based on items found during the search of the home. He argues, however, that the records indicate the vehicle arrived at the St. Charles Parish Sheriff's Office headquarters at 11:12 p.m. on April 24, 2026 [sic], and Detective Savoie's newly discovered police report indicated that the search began at 12:37 a.m., early in the morning on April 25, 2016. First, as noted, Detective Savoie's report did not provide new information as Detective Savoie testified at trial prior to revealing the existence of the report that the search began at 00:37 (12:37 a.m.). This time was also indicated on the search warrant he obtained and that was entered into evidence. We agree Detective Dewhirst's trial testimony regarding the reasons for seizing the vehicle is confusing because he stated at one point that they decided to seize the vehicle

based on information obtained in witness interviews and at another point he testified that it was based on information obtained during the search of the home. However, he was thoroughly cross-examined on this issue.

Relator finally contends that his trial counsel failed to specifically cross-examine Detective Dewhirst regarding his testimony at the suppression hearing indicating that the search of relator's home began earlier at "22:03" or 10:03 p.m. on April 24, 2016, while Detective Savoie testified that it began at 00:37. The evidence indicates that Detective Dewhirst was not present during the search of relator's home of when the vehicle was impounded, and that his testimony on this issue was not based on independent recollection. Further, as noted above the trial judge presided over the suppression hearing and at trial, and would have been aware of inconsistences. Counsel's choices of which questions to ask on cross-examination fall well within the ambit of trial strategy. *See State v. Brooks*, 94-2438 (La. 10/16/95), 661 So.2d 1333, 1337.

Considering all of these reasons outlined above, we find that relator failed to satisfy his burden to demonstrate that his trial counsel's performance was deficient or that any alleged deficiencies were so prejudicial that they affected the outcome of the trial.[302]

The Louisiana Supreme Court held that Beckley failed to show that he received ineffective assistance of counsel under *Strickland*.[303]

## 2. **AEDPA Standards and *Strickland***

The issue of ineffective assistance of counsel is a mixed question of law and fact.[304] Thus, under the AEDPA, this court must determine whether the state courts' denial of relief was contrary to or an unreasonable application of Supreme Court precedent.

The United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice.[305] The Supreme Court first held that "the defendant must show that counsel's

---

[302] St. R. Vol.14 of 18, 5th Cir Opinion, 21-KH-453, at 2-6, 10/27/21 (footnotes omitted).

[303] *Beckley*, 333 So. 3d at 1237; St. R. Vol. 18 of 18, La. S. Ct. Order, 2021-KH-01987, 3/15/22.

[304] *Strickland v. Washington*, 466 U.S. 688, 698 (1984); *Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir. 2012); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010).

[305] 466 U.S. at 697.

representation fell below an objective standard of reasonableness."[306]  Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[307]

In deciding ineffective assistance of counsel claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.[308]  A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' . . . But it is not enough under *Strickland*, 'that the errors had some conceivable effect on the outcome of the proceeding.'"[309]

On habeas review, the United States Supreme Court has clarified that, under *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom."[310] "Even under de novo review, the standard for judging counsel's representation is a most deferential one."[311]  The courts must therefore apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance."[312]

Federal habeas courts presume that litigation strategy is objectively reasonable unless clearly proven otherwise by the petitioner.[313]  "It is all too tempting to second-guess counsel's

---

[306] *Id.* at 687-88.

[307] *Id.* at 694; *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999).

[308] *Kimler*, 167 F.3d at 893.

[309] *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994) (citation omitted) (quoting *Strickland*, 466 U.S. at 693); *Harrington*, 562 U.S. at 112 (*Strickland* requires a "substantial" likelihood of a different result, not just "conceivable" one.)

[310] *Harrington*, 562 U.S. at 105.

[311] *Id.*

[312] *Strickland*, 466 U.S. at 690.

[313] *Id.* at 689; *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008); *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999).

assistance after conviction or adverse sentence."[314]  In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial.[315]  Tactical decisions, when supported by the circumstances, are objectively reasonable and do not amount to unconstitutionally deficient performance.[316]

### a.    Claim 3:  Request a *Daubert* Hearing

Beckley first claims that his trial counsel was ineffective in failing to request a *Daubert* hearing to challenge Dr. Eserman's classification of the victim's death as a homicide.  Beckley claims that Dr. Eserman's opinion was not based on any scientific methodology or technique.  He argues that, had a *Daubert* hearing been held, the trial court would have ruled Dr. Eserman's testimony regarding the cause of death inadmissible.

The State responds that Beckley fails to cite any authority supporting his claim that Dr. Eserman's testimony was inadmissible.  It further argues that trial counsel's decision to stipulate to Dr. Eserman's qualifications falls within the realm of trial strategy.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme Court set a new standard to assist federal district courts in evaluating the admissibility of expert testimony.[317]  The new standard required the district courts to perform a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[318]  Once expert testimony is admitted at trial, it is for the trier of fact to resolve the credibility and the

---

[314] *Harrington*, 562 U.S. at 105.

[315] *Strickland*, 466 U.S. at 689; *Neal*, 286 F.3d at 236-37; *Clark v. Johnson*, 227 F.3d 273, 282-83 (5th Cir. 2000), *cert. denied*, 531 U.S. 1167 (2001).

[316] *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999) (citing *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997); *Mann v. Scott*, 41 F.3d 968, 983-84 (5th Cir. 1994)).

[317] 509 U.S. 579, 592-95 (1993).

[318] *Id.* at 589.

reliability of the expert's testimony. " '[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.' "[319]  Notably, "*Daubert* is an exegesis of Rule 702 of the Federal Rules of Civil Procedure and governs the admission of expert evidence in federal trials only.  *Daubert* does not bind the states, which are free to formulate their own rules of evidence subject only to the limits imposed by the Constitution."[320]

The Louisiana Supreme Court has adopted the *Daubert* analysis only in instances where the methodology used by an expert is being questioned.[321]  One factor courts consider in determining whether to qualify a witness as an expert is whether a witness was previously qualified as an expert.[322]  However, this is not the challenge being made by Beckley in this case.  Instead, Beckley is challenging the constitutional effectiveness of his counsel's failure to question the qualifications of Dr. Eserman.  He has not shown a reason for counsel to have done so.

Initially, the purpose of a *Daubert* hearing is "to ensure that only reliable and relevant expert testimony is presented to the jury."[323]  Beckley had a bench trial.  The Fifth Circuit has advised that "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."[324]  Where, as here, there is

---

[319] *Primrose Operating Co. v. Natl. American Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United State v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) ).

[320] *Kinder v. Bowersox*, 272 F.3d 532, 545 n. 9 (8th Cir. 2001).

[321] *State v. Foret*, 628 So. 2d 1116, 1121, 1123 (La. 11/30/93); *see also Dinett v. Lakeside Hospital*, 811 So. 2d 116, 119 (La. App. 4th Cir. 2/20/02).

[322] *State v. Craig*, 699 So. 2d 865, 870 (La. 5/20/97) (citations omitted).

[323] *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1999) (superseded by rule on other grounds) (citing *Daubert*, 509 U.S. at 590-93).

[324] *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000).

no jury, there is "no risk of tainting the trial by exposing a jury to reliable evidence,"[325] and "the need for pre-trial rulings on the admissibility of evidence is significantly reduced."[326]

At trial, defense counsel stipulated to Dr. Eserman's credentials and that she was an expert in forensic pathology.[327] Presumably defense counsel made a strategic choice to enter into the stipulation. Where a stipulation is a concession of facts that the State could have easily established at trial and no advantage would have inured to a petitioner had counsel refused to enter the stipulation, counsel is not ineffective when he enters into such a stipulation.[328]

Here, the prosecution could have easily established that Dr. Eserman was an expert in the field of forensic pathology. Dr. Eserman testified that she was the deputy coroner for Jefferson Parish and a board certified forensic pathologist.[329] She testified as an expert in the field of forensic pathology on numerous occasions both before and after Beckley's trial.[330] Her curriculum vitae, which was admitted into evidence, shows that she worked as a forensic pathologist and deputy coroner for the Jefferson Parish Forensic Center since August 2011.[331] Further, Louisiana courts

---

[325] *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010).

[326] *Tucker v. United States*, No. 18-4056-WBV-MBN, 2019 WL 4221070, at *2 (E.D. La. Sept. 5, 2019) (citing *Luwisch v. American Marine Corporation*, Civ. A. No. 17-3241, 2018 WL 3019019, at *3 (E.D. La. June 18, 2018) (citing United States v. Cardenas, 9 F.3d 1139, 1154 (5th Cir. 1993)) and *Government of the Canal Zone v. Jiminez G.*, 580 F.2d 897, 897 (5th Cir. 1978)).

[327] St. R. Vol. 5 of 18 at 221, Trial Tr., 10/11/17.

[328] *See Berry v. King*, 765 F.2d 451, 454-55 (5th Cir. 1985); *McGee v. Cain*, No. 06-11360, 2007 WL 4591227, at *12 (E.D. La. Dec. 26, 2007); *Parker v. 24th Judicial District Court*, No. 06-10551, 2007 WL 2893852, at *6 (E.D. La. Sept. 27, 2007).

[329] St. R. Vol. 5 of 18 at 221, Trial Tr., 10/11/17.

[330] *See State v. St. Romain*, 332 So. 3d 114, 121 (La. App. 1st Cir. 10/21/21); *State v. Manuel*, 325 So. 3d 513, 531 (La. App. 5th Cir. 6/2/21); *State v. Williams*, 308 So. 3d 791, 808-09 (La. App. 5th Cir. 12/30/20); *State v. Miller*, 308 So 3d 1246, 1250 (La. App. 5th Cir. 12/23/20); *State v. Ellis*, 276 So. 3d 633, 636 (La. App. 5th Cir. 7/15/19); *State v. Barnett*, 267 So. 3d 209, 219 (La. App. 5th Cir 4/3/19); *Hutchinson v. State*, 190 So 3d 1264, 1267 (La. App. 5th Cir. 4/27/16).

[331] St. R. Vol. 7 of 18 at 84-88, Curriculum Vitae of Marianna Eserman, M.D, 12/13/16.

have admitted expert testimony from forensic pathologists who were unable to determine the cause of death, but determined that the manner of death was homicide.[332]

Beckley has not shown that defense counsel could have successfully challenged Dr. Eserman's qualifications or her methodology.  Counsel is not ineffective for electing not to pursue a futile *Daubert* motion.[333]  Further, Beckley has not demonstrated that, even if trial counsel had insisted on a *Daubert* hearing, the result in this case would have been different

Finally, defense counsel vigorously cross-examined Dr. Eserman regarding her findings and her inability to determine the exact cause of death.[334]  Dr. Eserman conceded that there was no evidence of ruptured blood vessels in the eyes, neck injuries, or hemorrhage that would be indicative of strangulation.[335]  She, however, testified that she could not rule out strangulation as the cause of the victim's death.[336]

The denial of relief on this issue was not contrary to or an unreasonable application of *Strickland*.  Beckley is not entitled to relief on this issue.

### b.    Claim 4:  Subpoena Dr. Brogle to Testify at Trial

Beckley next claims his trial counsel was ineffective in failing to subpoena the coroner of St. Charles Parish, Dr. Brian Brogle, to testify at trial.  Beckley claims that Dr. Brogle's testimony

---

[332] *See State v. Mayeux*, 265 So. 3d 1096 (La. App. 3rd Cir. 2/6/19) (expert testimony that victim died before the fire that burned her body), *cert. granted*, *Mayeux v. Louisiana*, 141 S. Ct. 225 (2020), *on remand*, *State v. Mayeux*, 312 So. 3d 250 (La. 3/9/21) (vacating conviction and sentence and remanding pursuant to *Ramos v. Louisiana*, 590 U.S. ----,140 S.Ct. 1390, 206 L.Ed.2d 583 (2020)); *State v. Vail*, 236 So. 3d 644, 650-51 (La. App. 3rd Cir. 12/28/17) (coroner determined victim was dead prior to entering the water and cause of death was homicide, not accidental drowning); *State v. Bunley*, 805 So. 2d 292 (La. App. 4th Cir. 12/12/01) (admission of forensic pathologist testimony that victim's death was a homicide and that she died of suffocation, a diagnosis of exclusion, was not error).
[333] *See Shields v. Dretke*, 122 F. App'x 133, 153 (5th Cir. 2005); *see also Flick v. Warren*, 465 F. App'x 461, 465 (6th Cir. 2012).
[334] St. R. Vol. 5 of 18 at 225-233, Trial Tr., 10/11/17.
[335] *Id.* at 229-32.
[336] *Id.* at 230-31.

was essential to explain how he determined that the victim's death was a homicide. He further claims that Dr. Brogle's testimony was necessary to explain his opinion why the Adderall found in the victim's system was not the cause of her death.

The State responds that Dr. Brogle was not a necessary witness. It explains that the testimony from Barry Minnich, the chief investigator, established that the coroner relied on the forensic pathologist's findings to classify the death as a homicide.

"'Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'"[337] To prevail, the petitioner must name the witness, demonstrate that the witness was available to testify and would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.[338] The Fifth Circuit has "clarified that the seemingly technical requirements of affirmatively showing availability and willingness to testify '[are] not a matter of formalism.'"[339]

Here, Beckley has not shown that Dr. Brogle's testimony would have been favorable to the defense or that he was available to testify. At trial, the State presented the testimony of the chief investigator of the St. Charles Parish Coroner's Office, Barry Minnich. Minnich testified that he and Dr. Brogle pronounced the victim deceased at the St. Rose Avenue scene.[340] He explained that the coroner determines manner of death after receiving the results of the autopsy, toxicology tests, and information from the investigation.[341] The coroner's report was entered into evidence.[342]

---

[337] *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)); *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008).
[338] *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Bray*, 265 F. App'x at 298).
[339] *Hooks v. Thaler*, 394 F. App'x 79, 83 (5th Cir. 2010) (quoting *Woodfox*, 609 F.3d at 808).
[340] St. R. Vol. 5 of 18 at 153, Trial Tr., 10/10/17.
[341] *Id.* at 154.
[342] *Id.* at 151.

According to the report, the cause of death was "homicidal violence of unknown means" and the manner of death was "homicide."[343]  Minnich explained that Dr. Brogle's determination was based on the information obtained from the forensic pathologist's examination of the victim as well as the observations from the scene.[344]

Beckley points to the December 13, 2016 hearing, at which Detective Dewhirst testified that Dr. Brogle told him that the victim had a minute amount of Adderall in her system, but that it was not enough to be the cause of her death.[345]  Detective Dewhirst explained that Dr. Brogle ruled official cause of death was homicidal violence of unknown means with the manner of death being a homicide.[346]

Notably, Dr. Eserman testified at that hearing that she ruled the victim's death as homicidal violence of unknown means.[347]  Dr. Eserman testified that the victim tested positive for an amphetamine, but explained that it could be a product of decomposition.[348]  That testimony was consistent with the toxicology results in her report which indicated "phenethylamine (amphetamine byproduct of decomposition)."[349]

It is clear from the foregoing testimony that Dr. Brogle relied on the findings of Drs. Eserman and Minnich's crime scene investigation to classify the victim's death as a homicide. Further, there is no evidence that the victim's death was caused by an amphetamine.

Again, Beckley has not shown that Dr. Brogle's testimony would have been favorable to the defense.  Nor has he shown that Dr. Brogle was available to testify.  The denial of relief on this

---

[343] St. R. Vol. 7 of 18, Coroner's Report, 5/24/16.
[344] St. R. Vol. 5 of 18 at 154-5, Trial Tr., 10/10/17.
[345] St. R. Vol. 7 of 18, Hearing Tr., at 13, 12/13/16.
[346] *Id.*
[347] *Id.* at 26.
[348] *Id.* at 26-27.
[349] St. R. Vol. 7 of 18 at 89, Forensic Examination, Report, 5/11/16.

issue was not contrary to or an unreasonable application of *Strickland*.  Beckley is not entitled to relief on this issue.

### c.    Claim 5:  Prosecutorial Misconduct

Beckley next claims that his trial counsel was ineffective in failing to object to alleged prosecutorial misconduct.  He claims that the State was ordered to provide to defense counsel a copy of the digital audio recording of the "re-interview" of Beckley conducted by the St. Charles Parish Sheriff's Office on the morning of April 25, 2016.  He further claims that, while the State falsely claimed it had produced the audio recording, a copy was never given to the defense.

The State responds that Beckley had full access to the audio when he was allowed to view the videos of the interview.

At a hearing held on September 6, 2017, defense counsel explained that Beckley was in the interview room for thirteen hours and was recorded the entire time.[350]  Defense counsel requested that he be provided with a copy of any recorded conversations with Beckley.[351]  Defense counsel also requested that Beckley be permitted to watch the thirteen hour video.[352]  The trial court instructed the Sheriff's Office to facilitate the matter.[353]

By order dated September 6, 2017, the trial court ordered the State to provide a copy of the audio recording to defense counsel.[354]  At a hearing on September 18, 2017, Beckley himself admitted that he had viewed videos showing two different angles of the interview and that a disc of the interviews had been provided to him.[355]  Defense counsel confirmed that the audio was also

---

[350] St. R. Vol. 8 of 18, Hearing Tr., at 21, 9/6/17.
[351] *Id.* at 25-26.
[352] *Id.* at 42-45.  Defense counsel clarified that he had viewed parts of the video with Beckley, but that there was no audio on that particular copy.  *Id.* at 51.
[353] *Id.* at 43-44, 52.
[354] St. R. Vol. 14 of 18, Order, at 2, 9/6/17.
[355] St. R. Vol. 4 of 18, Hearing Tr., at 22-25, 9/18/17.

provided and reviewed.[356]  Beckley confirmed that he had listened to the audio.[357]  The State also

confirmed that the video with audio had been provided to Beckley.[358]  Defense counsel confirmed

that he had the video in his possession.[359]  At a September 22, 2017 hearing, all discovery was

satisfied.[360]  Defense counsel further advised in a letter dated May 17, 2018, that Beckley was

provided with a copy of the videos and viewed them.[361]

Contrary to Beckley's claim,[362] defense counsel did not admit that the audio recording had

never been given to Beckley.  Defense counsel stated, in a letter to Beckley, as follows:

> Now to answer your main question from the February 5, 2018, February 20, 2018, and the new May 8, 2018 letters, this "Re-interview" transcript for which you ask.  Based on the date that you provided as April 25, 2018, I can only assume this "Re-interview" of which you speak, is the latter portion of interviews conducted when you were brought to the St. Charles Parish Sheriff's Office.  Your Interview with the Sheriff's Office, with Joseph Dewhirst, Chris Baird, and David Ehrmann, were recorded on video.  You have been previously provided with access to these videos prior to trial while you were in the Nelson Coleman Correctional Center.  You were provided with a laptop computer and time was given to you by the Warden's Office to review these videos at your leisure.  Watching these videos, you can see that after the initial interview conducted by Joseph Dewhirst, you are kept in the room for several more hours.  During that time, you are spoken with by Chris Baird (about family), and then by David Ehrmann (about polygraph testing).  Later in the video, Joseph Dewhirst comes back, and begins pressing you with more questions.  I can only assume that this is the "Re-Interview" of which you speak.  This video, the whole video, has been provided to you in the same electronic format that it was provided to me.  The specific portions, for which you are asking, would be found in the video portion that occurred between 3:00am and 4:00am.  You can gain access to this video by requesting it through Angola Legal Programs, as I have previously informed you.  To reiterate this, the video is specifically on Disc 22 of the electronic information provided to you in your previous request.  This video contains both the visual and the audio portion of the interview.  The specific portion

---

[356] *Id.* at 24-25.

[357] *Id.* at 25.

[358] *Id.* at 25-27.

[359] *Id.* at 28.

[360] St. R, Vol. 7 of 14, at 58, Docket Master Entry (16-0468), 9/22/17.

[361] St. R. Vol. 14 of 18, Letter, at 2-3, 5/17/18.

[362] *See* ECF No. 4, at 13.

69

> in [sic] contained within the files 0300000S.ssf, and 0300001S.ssf.  To my
> knowledge, there is no standalone portion of this part of the interview.[363]

Defense counsel explained that there was no *written* transcript of "re-interview," a fact that Beckley had been informed of on several occasions, but confirmed that the video provided to Beckley included audio.[364]

The record simply does not support Beckley's claim that the State failed to abide by the trial court order or that it made any false statement to the trial court when it advised that Beckley had been given a copy of the audio/video.  As a result, no objection could properly be lodged on that basis.  Had defense counsel raised such an objection it would have been overruled as meritless.[365]

The denial of relief on this issue was not contrary to or an unreasonable application of *Strickland*.  Beckley is not entitled to relief on this issue.

### d.    Claim 6:  Retain an Expert in Pathology & Toxicology

Beckley faults his trial counsel for failing to secure an expert in pathology and toxicology to aid in his defense.  He claims that Adderall and ethanol were found in the victim's system and that it is possible that the victim died of cardiac failure.

The State responds that Beckley fails to explain how an expert would have assisted in his defense or that an expert would have reached an opinion different from Dr. Eserman.

Initially, the law is well settled that an indigent defendant does not have an automatic right to expert assistance, even upon demand.[366]  Rather, he must "establish a reasonable probability

---

[363] ECF Doc. No. 4-6, at 34.
[364] *Id.* at 35-36.
[365] *See Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) ("'[F]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.'") (quoting *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994); *see also Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.")).
[366] *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993).

that the requested experts would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial."[367]   The requirement that the petitioner establish prejudice based on his counsel's failure to call a witness by naming the witness, setting forth the proposed testimony, demonstrating that the witness was available and would have testified, and showing the testimony would have been favorable to his defense applies to both lay and expert witnesses.[368]

Beckley merely speculates that the victim could have died as a result of an adverse reaction of two substances.  He, however, has presented no actual evidence demonstrating that an expert was available and would have testified that the victim died from cardiac failure or as a result of a mixture of Adderall and ethanol.[369]   Indeed, Beckley has not even identified an expert witness who was available and willing to testify.   Nor has he set forth the content or substance of the unidentified expert witness' proposed testimony.   As a result, this court cannot find counsel ineffective for failing to present the testimony of a purely theoretical expert.[370]   The state courts reasonably concluded that Beckley is not entitled to relief under *Strickland*.  Beckley is not entitled to relief as to this claim.

### e.   Claim 7:  Investigate an Alibi Defense

Beckley claims his counsel was ineffective when he failed to investigate the case and present an alibi defense.  He claims that the date of the victim's death is April 24, 2016.  He further

---

[367] *Id.*; *Griffith v. Quarterman*, 196 F. App'x 237, 243 (5th Cir. 2006); *see also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland*, 466 U.S. at 687).

[368] *Woodfox*, 609 F.2d at 808 (citing *Day*, F.2d 566 at 538).

[369] *See Scott v. Louisiana*, 934 F.2d 631, 633 (5th Cir. 1991).

[370] *Anthony v. Cain*, No. 07-3223, 2009 WL 3564827, at *8 ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue.")

claims that Price, Lachelle Williams, a friend of the family, and he all told investigators that he was with Price on April 24, 2016.

The State responds that April 24, 2016 is the date the victim's body was found. It points out that Beckley's vehicle was captured by surveillance video on April 22, 2016, going to and leaving the area where the victim as found. It argues that Beckley has no alibi for that date.

The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on matters of trial strategy, including presentation of evidence and questioning of witnesses, through the distorting lens of hindsight; rather, courts must employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.[371] It is irrelevant that another attorney might have made other choices or handled such issues differently. As the Supreme Court noted: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."[372]

Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[373] However, the defense of a criminal case does not "contemplate the employment of wholly unlimited time and resources."[374] An attorney is not necessarily ineffective for failing to investigate every conceivable, potentially nonfrivolous matter or defense.[375] "'A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would

---

[371] *Strickland*, 466 U.S. at 689.

[372] *Id.*

[373] *Strickland*, 466 U.S. at 691; *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986).

[374] *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992).

[375] *Id.*

have revealed and how it would have altered the outcome of the trial.'"[376]  A petitioner cannot show prejudice as to a claim that his counsel failed to investigate without adducing what the investigation would have shown.[377]  To prevail on such a claim, petitioner must provide factual support showing what exculpatory evidence further investigation would have revealed.[378]

As concluded by the state courts, Beckley has not met the requirements necessary to succeed on a claim based on his trial counsel's failure to investigate and present an alibi defense. Beckley was alleged to have murdered the victim on April 22, 2016, the day she was noticed missing.[379]  While Assistant Coroner Minnich testified that he responded to the St. Rose Avenue scene and pronounced the victim's death at 5:30 p.m. on April 24, 2016, he specifically testified that he did not know when the victim actually died; rather he merely made a pronouncement of death.[380]

Dr. Eserman, who conducted the autopsy, testified that the condition of the victim's body could be consistent with being partially submerged in water for two and a half days.[381]  She explained that the victim's body was in an advanced state of decomposition.[382]  She further explained that the state of her body at the time of examination was consistent with her body being there for several days.[383]

---

[376] *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998) (citation omitted); *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011).

[377] *Diaz v. Quarterman*, 239 F. App'x 886, 890 (5th Cir. 2007) (recognizing that some evidence is required to show that "the decision reached would reasonably likely have been different.") (citing *Strickland*, 466 U.S. at 696).

[378] *Moawad*, 143 F.3d at 948; *Brown v. Dretke*, 419 F.3d 365, 375 (5th Cir. 2005); *Davis v. Cain*, No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008).

[379] St. R. Vol. 4 of 18 at 8, Bill of Indictment, 9/29/17.

[380] St. R. Vol. 5 of 18 at 151, 153, Trial Tr., 10/10/17.

[381] St. R. Vol. 5 of 18 at 222, Trial Tr., 10/11/17.

[382] *Id.*

[383] *Id.* at 228.

Beckley does not contend that he had an alibi for the morning of April 22, 2016. Further, as pointed out by the State, surveillance video showed Beckley's car travel from his home to the St. Rose Avenue scene and return to his home in the early morning on April 22, 2016.[384]

Beckley has not shown that defense counsel was ineffective in failing to raise an alibi defense or any resulting prejudice. The state courts' denial of relief was not contrary to or an unreasonable application of *Strickland*. Beckley is not entitled to relief on this issue.

### f.    Claim 8:  Move for a Mistrial Based on Police Report & Sequestration Violation

Beckley claims that his trial counsel was ineffective in failing to request a mistrial when it was discovered that a Kenner Police Department report had not been given to the defense prior to trial and when it was learned that Detective Dewhirst violated the trial court's sequestration order. Beckley claims that the report included information that contradicted Detective Dewhirst's suppression hearing testimony. He further claims that Detective Dewhirst reviewed the police report prior to his testimony in violation of the sequestration order.

The State responds that the police report did not include any new information and that defense counsel re-examined Detective Savoie after reviewing the report. It further argues that any violation of the sequestration order did not justify a mistrial.

A decision as to whether to move for a mistrial is one of trial strategy.[385] The United States Fifth Circuit Court of Appeal has noted that counsel's "conscious and informed" strategic decision not to seek a mistrial "cannot be the basis for constitutionally ineffective assistance unless it is so

---

[384] *Id.* at 289-300.

[385] *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008) ("It is oft-recognized that the decision not to seek a mistrial is frequently a strategic one."); *see Hatch v. Lambert*, 215 F. App'x 614, 615 (9th Cir. 2006); *Brooks v. Cain*, No. 06-1869, 2009 WL 3088323, at *17 (E.D. La. Sept. 21, 2009); *Franklin v. Thompson*, No. 07-543, 2007 WL 3046642, at *12 (E.D. La. Oct. 17, 2007).

ill chosen that it permeates the entire trial with obvious unfairness."[386]  In making that decision, counsel is "required to balance the harm caused by the [improper conduct] against the legitimate possibility that a new trial would present less propitious prospects for his client."[387]

Moreover, it is clear that the strategic decisions of counsel are accorded a large measure of deference.  Indeed, as noted *supra*, the United States Supreme Court expressly held in *Strickland*: "Judicial scrutiny of counsel's performance must be highly deferential. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."[388]

Mistrials do not always benefit the defense.  For example, when a mistrial is declared and the case must be tried again from scratch, there is always a risk that in the new trial the State might bolster and present its case more effectively.  Faced with such considerations, counsel, who knows his case and was present for the trial, is generally in the best position to weigh the relative benefits of proceeding to a verdict against attempting to force a retrial by moving for mistrial.  Accordingly, a habeas court, whose knowledge of a case is limited to a cold record, should second-guess trial counsel's decisions on such matters only in the most egregious circumstances.

Prior to any witness testimony, the trial court issued a sequestration order.[389]  As previously explained, Detective Savoie, the second witness for the State, testified that he did not forward his report to the St. Charles Parish Sheriff's Office because it had not yet been approved.[390]  Savoie

---

[386] *Ward v. Dretke*, 420 F.3d 479, 491 (5th Cir. 2005) (quoting *Martinez v. Dretke*, 404 F.3d 878, 885 (5th Cir. 2005) (internal quotations omitted)).
[387] *Id.*
[388] 466 U.S. at 689 (quotation marks omitted).
[389] St. R. Vol. 5 of 18 at 106, Trial Tr., 10/10/17.
[390] *Id.* at 130-31.

testified that the information in his report was no different from his trial testimony.[391]  The trial court ordered Detective Savoie to produce the report.[392]  After the lunch recess, the defense recalled Detective Savoie who testified that he received the report from his superior with grammatical changes, but that no changes were made in the context and narrative.[393]  The report was admitted into evidence.[394]

The report provides information of the investigation from approximately 9:22 p.m. on April 24, 2016.[395]  The report indicates that  a search warrant for the residence was obtained and executed at 0037 hours on April 25, 2016, and concluded at 0301 hours.[396]  Detective Savoie's last involvement with the investigation occurred on April 26, 2016, after which he requested the Kenner Police Department investigation to be administratively closed as the St. Charles Sheriff's Office was leading the investigation.[397]

Two days later, Detective Dewhirst testified on cross-examination that he was aware that the State had received Detective Savoie's report during the trial.[398]  Detective Dewhirst testified that he read over Detective Savoie's report and that Savoie assisted with the initial investigation and helped secure a search warrant.[399]  Dewhirst explained that the St. Charles Parish Sheriff's Office took over the investigation because the body was found in its jurisdiction.[400]

---

[391] *Id.* at 133.
[392] *Id.* at 134.
[393] *Id.* at 147.
[394] *Id.*
[395] St. R. Vol. 8 of 18, Kenner Police Department Report, 10/10/17.
[396] *Id.* at 3-4.
[397] *Id.* at 5.
[398] St. R. Vol. 6 of 18 at 319, Trial Tr., 10/12/17.
[399] *Id.* at 320.
[400] *Id.* at 320-23.

Initially, LA. CODE EVID. art 615(B) provides that the case agent is to be excluded from an order of sequestration.  In this case, Detective Dewhirst was the lead investigator, and as such, would not have been subject to the sequestration order.  Therefore, it is likely that the prosecution confirmed with him after Detective Savoie's initial testimony, to determine whether he was previously aware of the report.

Further, even if there had been a violation, under LA. CODE EVID. art. 615(C) the appropriate response to a violation of a sequestration order is for a court to impose sanctions, admonish the jury, or even disqualify a witness.  There is no provision in Louisiana law that would have prompted or required defense counsel to assert a motion for mistrial for a mere violation of a sequestration order.  Rather, a violation of a sequestration order does not warrant a mistrial unless the violation materially prejudiced the defendant.[401]  Beckley has not shown how Dewhirst's review of Savoie's report prior to testifying materially prejudiced him.

Under Louisiana law, the trial court may order a mistrial upon motion of the defendant when a party fails to comply with discovery requests.[402]  Again, however, a mistrial is a drastic remedy and should be declared only when substantial prejudice results to the accused depriving him of a reasonable expectation of a fair trial.[403]

Here, Beckley has not established that he was denied a fair trial or prejudiced in any way by the late disclosure of the Kenner Police Department report.  The Kenner Police Department report did not include any new information nor any information beneficial to the defense.  Defense counsel had an opportunity to review the report early on in the trial and was permitted to recall and further examine Detective Savoie after the report was disclosed.

---

[401] *State v. Humbles*, 169 So. 3d 547, 555 (La. App. 5th Cir. 3/11/15) (citation omitted).
[402] LA. CODE CRIM. PROC. art. 729.5(A).
[403] *State v. Harris,* 812 So. 2d 612, 617 (La. 2/26/02) (citation omitted).

Louisiana law did not require or provide any support for his counsel to move for a mistrial where no basis for such a motion existed. Counsel did not act deficiently or prejudicially in failing to present a meritless motion.[404]

The state courts' denial of relief was not contrary to or an unreasonable application of *Strickland*. Beckley is not entitled to relief on this issue.

### g.     Claim 9:  Failure to Impeach Dewhirst's Suppression Hearing Testimony

Beckley claims his counsel was ineffective in failing to impeach at trial Detective Dewhirst's suppression hearing testimony relating to the reason Beckley's vehicle was seized as well as the timing of the search of the residence and the seizure of his vehicle. Beckley claims that his counsel should have impeached Dewhirst's testimony with information included in Detective Savoie's report that contradicted testimony Dewhirst gave at the suppression hearing.

The State responds that the trial court, which also presided over the suppression hearing, was aware of any inconsistences when rendering a verdict in this judge-tried case. It further argues that defense counsel's performance did not fall below the minimum standards, and that Beckley has not shown a reasonable probability in the outcome of the trial had defense counsel questioned Dewhirst about the inconsistencies.

The method and scope of cross examination is a type of trial strategy for which counsel is granted reasonable latitude.[405] The federal courts have made clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a

---

[404] *See Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir.1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir.1990) (concluding that "counsel is not required to make futile motions or objections.").

[405] *See United States v. Octave*, No. 12-205, 2015 WL 6620117, at *6 (E.D. La. Oct. 30, 2015) (citing *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011)).

quintessential exercise of professional judgment."[406]  There is a strong presumption that counsel has exercised his professional judgment reasonably.

Beckley appears to assert that Detective Dewhirst falsely testified that the vehicle was seized based on the information gleaned from the witness interviews as well as evidence found during a search of the residence.  Beckley claims that the recorded witness interviews did not commence until after the commencement of the search of the residence and the seizure of his vehicle.  Beckley relies on the Kenner Police Department report, which indicates that Detective Savoie "submitted a search warrant for the residence" at 0037 hours on April 25, 2016, and that it was "reviewed and later signed" by a commissioner for the court.[407]  The report further indicates that the search warrant was executed at 0037 and terminated at 0301 hours.[408]

A suppression hearing was held on October 2, 2017, eight days prior to the trial.[409]  At the hearing, Detective Dewhirst explained that he could provide a summary of events but could not provide specific times of the search of the residence or the seizure of the vehicle.[410]  Dewhirst reviewed the report of crime scene technician Jason Troxler and acknowledged that the report indicated that Troxler and Sergeant Pitchford were executing the search warrant on the home at 2300 hours.[411]  Detective Dewhirst testified that Troxler's report indicated that Troxler arrived at

---

[406] *Ford v. Cockrell*, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), *aff'd*, 135 F. App'x 769 (5th Cir. 2005); *accord Lewis v. Cain*, No. 09-2848, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), *aff'd*, 444 F. App'x 835 (5th Cir. 2011); *Williams v. Cain*, Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), *aff'd*, 359 F. App'x 462 (5th Cir. 2009); *Parker v. Cain*, 445 F. Supp. 2d 685, 710 (E.D. La. 2006).
[407] St. R. Vol. 8 of 18, Kenner Police Report, at 3, 10/10/17.
[408] *Id.* at 4.
[409] St. R. Vol. 5 of 18 at 49-73, Hearing Tr., 10/2/17.
[410] *Id.* at 54.
[411] *Id.* at 56.

the house at 10:30 p.m. on April 24, 2016.[412]  Dewhirst explained that he was not present during

the search as he was conducting witness interviews at that time.[413]  Dewhirst specifically testified:

> During those interviews, I was on the phone with Detective Pitchford and
> informed him of the possible evidence located inside the residence.
>
> And I believe the times may be a little off due to the fact that in here it says
> that they executed the search warrant on the residence at 0050 hours, which would
> have been 12:50 in the morning, that the vehicle was towed at 2312 hours.
>
> I guess what you are asking, because the times aren't matching up, based
> on just the interviews, I requested that the vehicle be towed back to our office
> because in the initial Kenner search warrant, I believe it was for the residence and
> the vehicle because it was on the curtilage.
>
> The times may be off as to when we towed the vehicle, did the search
> warrant on the vehicle, and then the search of the residence.
>
> Based on the information I had at the time, that's the purpose of us towing
> the vehicle.[414]

Dewhirst explained that he learned from Price that there were bungee cords in the residence.[415]

He admitted that her official recorded interview commenced at 0007 hours on April 25, 2016, but

explained that he commenced speaking with Price and Beckley at approximately 8:00 or 9:00 p.m.

on April 24, 2016, when they were still at the residence.[416]

On cross-examination, Detective Dewhirst testified that the search warrant return indicated

that the search proceeded at 2203 hours on April 24, 2016, and ended at 0301 hours on April 25,

2016.[417]  Dewhirst also testified that Price gave written consent to search the home.[418]  He

---

[412] *Id.* at 57.

[413] *Id.* at 58.

[414] *Id.*

[415] *Id.* a

[416] *Id.* at 59-60.

[417] *Id.* at 62.

[418] *Id.*

explained that he believed the vehicle was possibly used in the commission of the crime, and it was therefore impounded.[419]

Notably, while Detective Savoie did not testify at the suppression hearing, his affidavit in support of the search warrant for the residence and its curtilage included information that multiple witnesses had observed Beckley cleaning his vehicle and disposing of items from his trunk after the victim went missing.[420]  He also stated that a family friend advised that she noticed that Beckley began "changing his story" when he spoke to different people about the incident.[421]

At trial, Detective Savoie explained that, after responding to the residence to secure the area based on the large crowd of people, he returned to the police department, secured the search warrant for the residence, and then returned to the residence to execute the warrant.[422]  He testified that the execution of the search warrant occurred after 0037 hours on April 25, 2016.[423]

At trial, defense counsel did not specifically question Detective Dewhirst about the timing of the search warrant for the residence, the reasoning behind the impounding of the vehicle, or the timing of its seizure.  A review of the trial transcript, however, shows that defense counsel extensively cross-examined Dewhirst and vigorously attacked his investigation of the case as well as his credibility.[424]  Further, in his closing argument, defense counsel argued that the investigation was not thorough.[425]

While defense counsel did not cross-examine Dewhirst about the timing of the search warrant for the residence or the reasoning for the impounding of the vehicle, Beckley has not

---

[419] *Id.* at 63.
[420] St. R. Vol. 8 of 18, Affidavit for Search and Seizure Warrant, at 2, 4/25/16.
[421] *Id.*
[422] St. R. Vol. 5 of 18 at 122, Trial Tr., 10/10/17.
[423] *Id.* at 127
[424] *See* St. R. Vol. 6 of 18 at 319-76, Trial Tr., 10/12/17.
[425] St. R. Vol. 6 of 18 at 532-550, Trial Tr., 10/13/17.

offered any evidence to demonstrate that this failure altered the outcome of his trial. His unsupported speculation is insufficient to satisfy the prejudice prong of *Strickland*.

It is clear from the record that defense counsel attempted to discredit Dewhirst through cross-examination in an effort to raise doubt about the reliability of his testimony and in support of Beckley's claim of actual innocence. The testimony was presented to the trial judge, who as the trier of fact, weighed and considered the testimony. The fact that the trial judge did not believe the defense does not render counsel's performance constitutionally deficient.[426] "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."[427]

The state courts' denial of relief was not contrary to or an unreasonable application of *Strickland*. Beckley is not entitled to relief on this issue.

### E.    Claims 16-27: Ineffective Assistance of Appellate Counsel

Beckley claims his appellate counsel was ineffective in failing to raise specific issues on appeal. Specifically, Beckley claims his appellate counsel should have raised the following issues on appeal:

(1) the denial of the motion to quash;
(2) the denial of the request for a bill of particulars;
(3) the denial of the defense's motion relating to lack of jurisdiction;
(4) the overruling of the defense's objection to referring to the victim's death as a homicide;
(5) excessive bail;
(6) an incomplete record;
(7) there was no record demonstrating that Beckley waived his right to a jury trial;
(8) denial of the motion to suppress;
(9) violation of his right to confront witnesses;
(10) prosecutorial misconduct; and
(11) violation of *Brady*.

---

[426] *See Martinez v. Dretke*, 99 F. App'x 538, 543 (5th Cir. 2004) ("[A]n unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").
[427] *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted).

1.    **State Court Rulings**

Beckley raised each of these claims in his application for post-conviction relief.   The

Louisiana Fifth Circuit rejected the claims as follows:

**Ineffective Assistance of Appellate Counsel and**
**Incomplete Appellate Record – Claims 17 to 29**

Relator's Claims 17 through 28 arise from the alleged ineffective assistance
of his appellate counsel.

In reviewing claims of ineffective assistance of counsel on direct appeal,
the Supreme Court of the United States has expressly observed that appellate
counsel need not advance every argument, regardless of merit, urged by the
defendant. *Evitts v. Lucey,* 469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985);
*State ex rel Sparkman v. State*, 15-1726 (La. 10/17/16), 202 So.3d 488, 491.  The
courts give great deference to professional appellate strategy and applaud counsel
for winnowing out weaker arguments on appeal and focusing on one central issue
if possible, and at most a few key issues.   This is true even when weaker arguments
have merit. *Jones v. Barnes*, 463 U.S. 745, 103 S. Ct. 3308, 77 L.Ed.2d 987 (1983).
When the claim of ineffective assistance of appellate counsel is based on the failure
to raise an issue on appeal, the prejudice prong of the *Strickland* test requires the
petitioner to establish that the appellate court would have granted relief, had the
issue been raised.   *United States v. Phillips*, 210 F.3d 345 (5th Cir. 2000);
*Sparkman*, *supra*.

In Claim 17, relator contends his appellate counsel was ineffective for
failing to raise an assignment of error based on the denial of his motion to quash
his arrest.  Relator contends his trial counsel argued his arrest should be quashed
because Detective Dewhirst falsified his affidavit supporting the request for the
warrant.   Specifically, relator contends the detective misrepresented that the
pathologist and coroner stated the victim was smothered.  However, the affidavit
only states while both the pathologist and coroner were unable to verify a cause,
suffocation was a possible cause.  This is not inconsistent with the testimony
ultimately provided at trial.  Relator also complains about alleged false information
regarding his "re-interview."  While he claims that he was not provided a transcript
of the re-interview, he does not argue that he never saw a video with audio of this
interview as explained above.  Finally, relator complains that Detective Dewhirst
misrepresented the time stamps of surveillance cameras in his affidavit.  However,
the detective explained at trial that some of the time stamps of the surveillance
videos were off and the times were adjusted by comparing the actual time with the
time stamps.

In Claim 18, relator contends that appellate counsel was ineffective for
failing to raise a claim regarding the denial of his motion for a bill of particulars.

The record indicates that counsel did not err in raising an assignment on this issue as the State provided realtor with open file discovery thereby relieving the State of the necessity of answering the motion for bill of particulars. *See State v. Parker*, 04-1017 (La. App. 5 Cir. 3/29/05), 901 So.2d 513, 519, *writ denied*, 05-1451 (La. 1/13/06), 920 So.2d 235.

In Claim19, relator contends appellate counsel was ineffective for failing to raise a claim regarding the alleged failure of the State to prove jurisdiction or venue existed in St. Charles Parish. The Court addressed and denied relator's complaints regarding the lack of jurisdiction and venue in a pre-trial writ application. *See State v. Beckley*, 17-82 (La. App. 5 Cir 3/7/17) (unpublished writ disposition). In this prior ruling, we recognized that the "exact location where [the victim] was murdered is unclear." We further recognized that pursuant to La.C.Cr.P. art 611(B), if a case involves a homicide and "it canoe be determined where the offense or elements of the [offense] occurred, the offense is deemed to have been committed in the parish where the body of the victim was found." Accordingly, we find appellate counsel was not ineffective for failing to raise this claim.

In Claim 20, relator contends appellate counsel was ineffective for failing to raise a claim regarding the trial court's alleged error in overruling relator's objection to calling the victim's death a homicide. The facts outlined above establish the evidence that existed to support the forensic pathologist's opinion that the victim's death was a homicide. The trial court did not err in denying this claim.

In Claim 21, relator contends appellate counsel was ineffective for failing to raise a claim that relator's bail in the amount of $1,000,000 bond was excessive. However, these claims became moot upon relator's conviction. *See State v. Crook*, 517 So.2d 1131, 1132 (La. App. 5th Cir. 1987), *writ denied*, 541 So.2d 885 (La. 1989).

In Claim 22, relator contends his appellate counsel was ineffective for failing to raise the claim of excessive sentence. Considering the trial court had no discretion in sentencing relator to life without benefits on the second degree murder charge, we find that the trial court did not err in denying this claim

In Claim 23, relator contends that appellate counsel was ineffective because he did not have a complete record of all proceedings to investigate. In related Claim 29, relator contends that the trial court violated his right to a meaningful trial because it did not include transcripts from all court appearances in the prior Case Nos. 16-263 and 16-468. He also contends that this Court did not rule on a motion to overturn his conviction and sentence due to the incomplete appellate record that relator filed with this Court while his appeal was pending. A defendant is not entitled to relief on the basis of an incomplete record absent a showing that he was prejudiced by the missing portions of the record. *State v. Campbell*, 06-0286 (La. 5/21/08), 983 So.2d 810, 873.

Contrary to relator's arguments, this Court addressed the issue of the appellate record several times during the appeal process. First, this Court ordered the production of certain additional transcripts from pre-trial proceedings, including the hearing on the motion to suppress and relator's colloquy with the trial court regarding the waiver of his right to a jury trial. In addition to filing his motion to overturn the proceedings, relator raised identical issues in his *pro se* assignment of error arguing that his conviction should be overturned due to the alleged incomplete appellate record. In our opinion affirming relator's convictions and sentences, *Beckley, supra*, we addressed these issues and determined, as we also do now, that relator failed to provide valid reasons as to why he required additional transcripts from additional pre-trial proceedings:

> Defendant has not indicated why the requested transcripts are relevant or set forth what errors the trial court allegedly made during those proceedings or hearings. Neither defendant nor his attorney has alleged that these transcripts are relevant to any assignments of error, as required by La. C.Cr.P. art. 914.1. As in *Sharp*, defendant's generic assertions that the lack of these transcripts makes a proper review of his appeal and "any and all assignment of error claims that will be made by Appellant" impossible amounts to a "fishing expedition," and such a generic claim is insufficient to support supplementation of the record.

*Beckley*, 273 So. 3d at 514.

After reviewing the claims raised in relator's writ application and the extensive arguments and supporting materials provided with his APCR, we do not find that the interests of justice require re-litigation of the issue of the appellate record or that appellate counsel was ineffective for not requesting additional transcripts for other pre-trial proceedings.

In Claim 24, relator contends that appellate counsel was ineffective for failing to raise the claim that relator did not waive his right to a jury trial. Relator claims that the appellate record does not contain any evidence of an intelligent waiver of his right to a jury trial. The supplement appellate record contains relator's written jury trial waiver, as well as a transcript of the colloquy between relator and the trial court regarding his jury trial waiver during which the trial court determined that relator made a knowing and voluntary waiver of this right to a jury trial. Based on the foregoing, we do not find relief would have been raised by appellant counsel.

In Claim 25, relator contends appellate counsel erred by failing to raise the issue of the trial court's denial of his motion to suppress evidence seized from his vehicle. Relator complains that his vehicle was seized before the issuance of the search warrant. While the record indicates that while relator's vehicle was impounded prior to the issuance of the warrant, the search of the vehicle did not occur until after a separate search warrant for the vehicle was issued. Therefore,

appellate counsel was not ineffective for raising an issue on appeal regarding the seizure of the vehicle.

Relator next argues in Claims 26 and 27, the appellate counsel was ineffective for failing to raise a claim regarding the violation of his right to confront and cross-examine witnesses because the coroner did not testify at trial and alleged prosecutorial misconduct for failing to turn over an audio recording of his "re-interview." These grounds were both addressed above and dismissed as part of relator's claims regarding the ineffective assistance of trial counsel. For the same reasons stated above, we also find that these claims lack merit with respect to the alleged ineffective assistance of relator's appellate counsel.

Finally, in Claim 28, relator contends that his appellate counsel was ineffective for failing to raise a claim regarding a *Brady* violation for the State's alleged failure to turn over Detective Savoie's police report. According to the record provided by relator, prosecutors were not in possession of this report prior to the start of trial. The record further indicates that report did not contain any new information that was not previously known to relator or that relator was prejudiced by the late disclosure of the report.[428]

The Louisiana Supreme Court found Beckley failed to show he received ineffective assistance of counsel under *Strickland*.[429]

## 2.    Application of Strickland to Appellate Counsel

Criminal defendants are entitled to effective assistance of counsel in their first appeal of right.[430] The *Strickland* standard for judging performance of counsel also applies to claims of ineffective appellate counsel.[431] To prevail on a claim that appellate counsel was constitutionally ineffective, a petitioner must show that his appellate counsel unreasonably failed to discover and assert a nonfrivolous issue and establish a reasonable probability that he would have prevailed on this issue on appeal but for his counsel's deficient representation.[432]

---

[428] St. R. Vol. 14 of 18, La. App. 5th Cir. Order, 21-453, at 7-10, 10/27/21.
[429] *Beckley*, 333 So. 3d at 1237; St. R. Vol. 18 of 18, La. Sup. Ct. Order, 2021-KH-01987, 3/15/22.
[430] *Evitts v. Lucey*, 469 U.S. 387, 394 (1985).
[431] *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).
[432] *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001); *Smith*, 528 U.S. at 285-86.

Effective appellate counsel is not required to assert every nonfrivolous available ground for appeal.[433] On the contrary, the United States Supreme Court has long recognized that appellate counsel filing a merits brief need not and should not argue every nonfrivolous claim; instead, appellate counsel may legitimately select from among them in the exercise of professional judgment to maximize the likelihood of success on appeal.[434] Appellate counsel has the discretion to exclude even a nonfrivolous issue if that issue was unlikely to prevail.[435] Thus, because one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be found constitutionally ineffective for failure to assert every conceivable issue.[436]

Rather, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."[437] Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits the client because "a brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions."[438] As a result, the test to be applied in assessing such a claim is whether the issue ignored by appellate counsel was "clearly stronger" than the issues actually presented on appeal.[439]

---

[433] *Green*, 160 F.3d at 1043 (citing *Evitts*, 469 U.S. at 394).

[434] *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983).

[435] *See Anderson v. Quarterman*, 204 F. App'x 402, 410 (5th Cir. 2006) ("The issues that Anderson argues his counsel should have raised on direct appeal . . . lack merit. As such, failure to raise these issues did not prejudice Anderson."); *Penson v. Ohio*, 488 U.S. 75, 83-84 (1988) (noting that courts have refused to find counsel ineffective when the proposed appellate issues are meritless); *Kossie v. Thaler*, 423 F. App'x 434, 437 (5th Cir. 2011) (recognizing the Supreme Court's basic rule that the presumption that appellate counsel was effective will be overcome only when the claims not asserted are stronger than those that were in fact raised).

[436] *Smith*, 528 U.S. at 288; *Jones*, 463 U.S. at 754.

[437] *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).

[438] *Id.* at 753.

[439] *See, e.g.*, *Diaz*, 228 F. App'x at 427; *accord Smith*, 528 U.S. at 288.

a.      **Claim 16:  Motion to Quash**

Beckley first claims that his appellate counsel was ineffective in failing to raise on appeal the denial of the motion to quash his arrest.  He claims that Detective Dewhirst fabricated information included in the affidavit in support of the arrest warrant.  He complains that Detective Dewhirst included false time stamps and omitted the correct times of surveillance videos.  He also complains that Dewhirst falsely claimed that the cause of death was suffocation.

The State contends that Beckley's allegations of false affidavits and misrepresentations are not supported by the testimony and evidence presented in this case.  As a result, the State asserts that the underlying claim is frivolous and appellate counsel was not ineffective for failing to assign the issue on appeal.

Under Louisiana law, a warrant of arrest shall be issued when:

(1) The person making the complaint executes an affidavit specifying, to his best knowledge and belief, the nature, date, and place of the offense, and the name and surname of the offender if known, and of the person injured if there be any.  An affidavit containing the electronic signature of the applicant shall satisfy the constitutional requirement that the testimony of the applicant be made under oath, provided that such signature is made under penalty of perjury and in compliance with R.S. 9:2603.1(D).

(2) The magistrate has probable cause to believe that an offense was committed and that the person against whom the complaint was made committed it.[440]

In his affidavit for an arrest warrant, Detective Dewhirst stated that, after an autopsy of the victim had been conducted, the pathologist initially advised that a cause of death could not be verified, but it was possible that the victim was smothered.[441]  He further stated that Dr. Brogle advised that, after consulting with the pathologist, the manner of death was homicidal violence of

---

[440] LA CODE CRIM. PROC. art. 202(A).
[441] St. R. Vol. 7 of 18 at 97, Affidavit for Arrest Warrant, 5/2/16.

undetermined etiology, most likely by suffocation.[442]    Dewhirst provided detailed information regarding surveillance camera footage depicting Beckley and his vehicle driving from the residence at 0025 hours, past the location where the victim was found at 0035 hours, stopping for gas and air for his tires at 0057 hours, and then traveling in the direction of his residence on April 22, 2016.[443]

Beckley filed a *pro se*, handwritten motion to quash, against defense counsel's advice, on August 28, 2017, on the grounds that Detective Dewhirst made false statements in his affidavit in support of the arrest warrant.[444]    The trial court denied the motion at a hearing on August 28, 2017.[445]

By order dated September 8, 2017, the trial court construed the *pro se* filing as a motion to quash the arrest warrant, found no basis to grant relief, and denied the motion.[446]    The trial court explained:

> The court will first consider this pro-se filing as a motion to quash the arrest warrant.  Louisiana Code of Criminal Procedure article 206 proscribes quashing or abating a warrant of arrest and releasing a person in custody of an offense "because of any infirmity or defect in the warrant."  Mr. Beckley's filing does not allege a specific defect in form or substance of the arrest warrant; only that Detective Dewhirst "fabricated evidence and falsified a search warrant."  It does not articulate which evidence is purportedly fabricated or falsified.

> Further, neither this Court nor Mr. Beckley could identify a vehicle authorized by the Louisiana Code of Criminal Procedure for the Court to conduct a pre-trial evidentiary hearing on non-specific allegations concerning the reliability and credibility of allegations against the defendant.  Mr. Beckley is charged by Bill of Indictment by a grand jury of this Parish.  This case is scheduled for trial on the merits commencing October 9, 217.  There will be ample opportunity at trial for

---

[442] *Id.* at 99.
[443] *Id.* at 98.
[444] St. R. Vol. 7 of 18 at 50, Pro Se Motion, 8/28/17; St. R. Vol. 8 of 18, Hearing Tr., at 17-20, 8/28/17.
[445] St. R. Vol. 8 of 18, Hearing Tr., at 17-21, 31, 8/28/17.
[446] St. R. Vol. 7 of 18 at 51-52, Order, 9/8/17.

Mr. Beckley to challenge the competence and credibility of evidence presented in support of a probable cause finding for his arrest.[447]

An arrest warrant affidavit is presumed to be valid.[448]  The burden is on the defendant to prove by a preponderance of the evidence that the representations in the affidavit are false.[449]

Beckley fails to meet that burden.  Detective Dewhirst's statement in the affidavit that the victim's manner of death was due to homicidal violence of undetermined etiology but possibly suffocation was consistent with the trial testimony of Dr. Eserman who testified that, due to the body's advanced state of decomposition, she could not rule out strangulation or suffocation as the cause of death.[450]  Furthermore, Detective Dewhirst testified at trial that some of the time stamps on the surveillance videos were not accurate.[451]  He explained that the times were adjusted by comparing the actual time that the detectives collected the videos with the time on the videos at the time they were collected.[452]

Beckley has not met his burden to show that any claim relating to the denial of his motion to quash his arrest was "clearly stronger" than the issues actually presented on appeal by counsel or that there is a reasonable probability that the appellate court would have vacated or reversed the trial court judgment if only the proposed claim had been asserted.  Therefore, he is not entitled to relief on this ineffective assistance of appellate counsel claim.

### b.    Claim 17:  Bill of Particulars

Beckley next claims that his appellate counsel was ineffective in failing to raise on appeal the denial of his request for a bill of particulars.

---

[447] *Id.*
[448] *State v. Sheil*, 204 So 3d 1213, 1217 (La. App. 5th Cir. 12/7/16) (citation omitted).
[449] *Id.* (citations omitted).
[450] *See* St. R. Vol. 5 of 18 at 224-26, 230-33, Trial Tr., 10/11/17
[451] *Id.* at 292-301.
[452] *Id.* at 292-93.

The State responds that there was no need for it to answer the request for a bill of particulars because it provided the defense with open file discovery.

Louisiana law provides that the defense can request a "bill of particulars setting forth more specifically the nature and cause of the charge against the defendant."[453]   A bill of particulars allows the defendant to obtain further information about what the state intends to prove and enables the defendant to better defend himself.[454]   However, providing open file discovery relieves the prosecution from answering a request for a bill of particulars.[455]

In this case, defense filed a motion for bill of particulars.[456]   At a hearing, it was determined that the defense was afforded open file discovery in this case.[457]   The trial court found that, because there was an agreement to open file discovery, and the State acknowledged its obligation, the State was relieved from the need to answer the bill of particulars.[458]   That ruling was in accordance with Louisiana law.

As a result, Beckley has not met his burden to show that the claim relating to the denial of the request for a bill of particulars was clearly stronger than those raised on appeal or that there is a reasonable probability that he would have prevailed if only the proposed claim had been asserted. The denial of relief on this claim was not contrary to or an unreasonable application of *Strickland*. Beckley is not entitled to relief as to this claim.

---

[453] LA. CODE CRIM. PROC. art. 484.

[454] *State v. Nelson*, 306 So. 2d 745, 747 (La. 1/20/75).

[455] *State v. Noil*, 807 So. 2d 295, 309 (La. App. 5th Cir. 12/26/01) (citing *State v. Ohrberg*, 488 So. 2d 1316, 1318-19 (La. App. 1st Cir. 1984)); *State v. Willis*, 823 So. 2d 1072, 1081 (La. App. 2d Cir. 8/14/02) (citing *State v. Phagans*, 412 So. 2d 580 (La. 1982); *State v. Glynn*, 653 So. 2d 1288 (La. App. 1st Cir. 4/7/95); *State v. Jone*s, 544 So. 2d 1209 (La. App. 3d Cir. 5/24/89)).

[456] St. R. Vol. 7 of 18 at 33-35, Bill of Particulars (16-0263), 11/16/16; *id.* at 70-73, Bill of Particulars (16-0468), 11/16/16.

[457] St. R. Vol. 7 of 18 at 37-38, Hearing Tr., 12/13/16.

[458] *Id.* at 41.

c.     **Claim 18:  Lack of Jurisdiction**

Beckley next claims that his appellate counsel was ineffective in failing to raise on appeal a claim that the State failed to prove jurisdiction.

The State responds that, because the victim's body was found in St Charles Parish and it could not be determined where she died, St. Charles Parish was the proper jurisdiction.

At the time of Beckley's trial, the applicable law provided:  "If the offender is charged with the crime of first or second degree murder and it cannot be determined where the offense or the elements of offense occurred, the offense is deemed to have been committed in the parish where the body of victim was found."[459]  Under Louisiana law, "[v]enue shall not be considered an essential element to be proven by the state at trial, rather it shall be a jurisdictional matter to be proven by the state by a preponderance of the evidence and decided by the court in advance of trial."[460]  The denial of a motion to quash should not be reversed on direct appeal in the absence of a clear abuse of the trial court's discretion.[461]

The trial court held a hearing on Beckley's motion to quash the bill of indictment for lack of jurisdiction and improper venue on December 13, 2016.[462]  Detective Dewhirst testified that he received the initial results of the autopsy which found that it was an undetermined death with possible suffocation as a cause.[463]  He explained that law enforcement was not able to determine where the victim died.[464]  He admitted that, initially, when he drew up the affidavit in support of Beckley's arrest, he believed that the victim had been murdered at her home due to the presence

---

[459] LA. CODE CRIM. PROC. art 611(B).
[460] *Id*. art. 615.
[461] *State v. Gross*, 273 So. 3d 317, 321 (La. App. 1st Cir. 2/25/19) (citation omitted).
[462] St. R. Vol. 7 of 18, Hearing Tr., 12/13/16.
[463] *Id.* at 13.
[464] *Id.* at 13-14.

of droplets of blood.[465]  However, after discussing the evidence with the other investigators, they decided that they could not determine with certainty where the victim died.[466]  Dr. Eserman testified that there was no way to determine whether the victim died in Kenner (Jefferson Parish) or St. Charles Parish.[467]

The trial court found that Detective Dewhirst disavowed under oath his initial theory that the victim was killed in Jefferson Parish.[468]  He noted Dr. Eserman's testimony that there was no way to determine where the victim died.[469]  As the victim's body was found in St. Charles Parish, the trial court denied the motion to quash the indictment.[470]

Beckley's trial counsel filed an application for writ of review.[471]  On March 7, 2017, the Louisiana Fifth Circuit denied the writ application, finding that, as it was unclear where the victim was murdered, venue in St. Charles Parish was proper.[472]

Given the evidence presented at the hearing and the fact that the intermediary appellate court had already denied a supervisory writ on the issue, Beckley has not shown that a claim related to the motion to quash the bill indictment based on jurisdiction or venue was clearly stronger than the issues raised on appeal by counsel.  Nor has he shown a reasonable probability that he would have prevailed had appellate counsel raised the issue on direct appeal.

The denial of relief on this claim was not contrary to or an unreasonable application of *Strickland*.  Beckley is not entitled to relief as to this claim.

---

[465] *Id.* at 14, 23.

[466] *Id.* at 23.

[467] *Id.* at 28-29.

[468] *Id.* at 35.

[469] *Id.*

[470] *Id.*

[471] St. R. Vol. 7 of 18, 5th Cir .Writ Application, 17-K-82, undated.

[472] St. R. Vol. 7 of 18 at 104-05, La. App. 5th Cir. Order, 17-K-82, 3/7/17.

### d.    Claim 19:  Referring to the Victim's Death as a Homicide

Beckley claims his appellate counsel should have argued on appeal that the trial court erred in overruling the defense's objection at the December 13, 2016 hearing to the death of the victim being referred to as a homicide.  He claims that there was no evidence that proved that anything was done to the victim to cause her death.

The State responds that the expert testimony clearly proved that the victim's death was the result of a homicide.  It continues that appellate counsel was not ineffective in failing to raise a frivolous issue.

At the December 13, 2016 hearing, the defense objected to the State's question to Detective Dewhirst as to whether he developed any leads as to "who may have done this to [the victim]."[473] Defense counsel argued that there was no evidence showing any cause of death.[474]  The trial court overruled the objection.[475] Dr. Eserman unequivocally testified at the hearing that the victim died of homicidal violence of unknown means.[476]  The report of her forensic examination of the victim that supported her opinion was admitted into evidence.[477]

Given the evidence presented at the hearing, Beckley has not shown that his counsel was ineffective for failing to raise on appeal the denial of the objection.  Beckley also cannot show that such a claim would have been successful or more meritorious than the claims asserted to the appellate court.

For these reasons, Beckley's claim of ineffective assistance of appellate counsel for failing to raise a claim regarding the overruling of the objection to referring to the victim's death as a

---

[473] St. R. Vol. 7 of 18, Hearing Tr., at 6-7, 12/13/16.
[474] *Id.* at 7.
[475] *Id.*
[476] *Id.* at 26.
[477] *Id.* at 25; *See* St. R. Vol. 7 of 18 at 89-92, Forensic Examination Report, 5/11/16.

homicide has no merit.  The denial of relief on this claim was not contrary to or an unreasonable application of *Strickland*.  Beckley is not entitled to relief as to this claim.

e.      **Claim 20:  Excessive Bond**

Beckley faults appellate counsel for failing to raise on appeal a claim of excessive bond. He claims that the trial court's $1,000,000 bond on the obstruction of justice charge was excessive.

The State responds that any claim of excessive bond became moot upon Beckley's conviction, and the claim would have been frivolous.

The record shows that defense counsel filed a motion for bond reduction.[478]  The trial court heard argument at the December 13, 2016 hearing.[479]  The trial court, pursuant to LA. CODE CRIM. PROC. art 334, denied the request for bond reduction citing the seriousness of the offense, the danger to others in community, and the testimony presented.[480]

Any issue regarding the failure to reduce Beckley's bond was rendered moot following his conviction.[481]  Beckley has not shown that the claim was clearly stronger than the claims raised on appeal by counsel or that there is a reasonable probability that the outcome of his appeal would have been different had the issue been raised.

The denial of relief on this issue was not contrary to or an unreasonable application of *Strickland*.  Beckley is not entitled to relief on this claim.

f.      **Claim 21:  Excessive Sentence**

Beckley claims his appellate counsel was ineffective in failing to raise on appeal a claim of excessive sentence.  He claims the denial of parole as to the obstruction of justice conviction

---

[478] St. R. Vol. 7 of 18 at 25, Motion for Reduction of Bond, 11/16/16.
[479] *Id.*, Hearing Tr., at 42-44, 12/13/16.
[480] *Id.* at 44.
[481] *State v. Brown*, 219 So. 3d 518, 532 (La. App. 5th Cir. 5/3/17) (citations omitted); *State v. Miller*, 102 So. 3d 956, 960 (La App. 5th Cir. 10/16/12) (citation omitted).

and the consecutive nature of the sentences make his sentences excessive given that his conviction was based on circumstantial evidence and the fact that he had no prior criminal record.  He also claims his sentences violate the Eighth Amendment

The State responds that Beckley's life sentence without benefits was mandated by law, and any claim of excessive sentence by appellate counsel would have been frivolous.

Louisiana law mandates a life sentence at hard labor without the benefit of parole, probation, or suspension of sentence for those convicted of second degree murder.[482]  The maximum penalty for obstruction of justice involving a criminal proceeding in which a sentence of life imprisonment may be imposed is forty years imprisonment at hard labor.[483]  Louisiana law further provides that if a defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively.[484]  A trial judge has the discretion to impose consecutive penalties based on the defendant's past criminal record, the gravity of the offense, or the risk to the community.[485]  Consecutive sentences are not necessarily excessive even when the crimes arise from a single course of conduct.[486]

In this case, the trial court sentenced Beckley to life without benefits as to the offense of second degree murder.[487]  The trial court sentenced Beckley to thirty years without benefits as to the offense of obstruction of justice, to be served consecutively to his life sentence.[488]  The trial court explained as follows:

---

[482] LA. REV. STAT. § 14:30.1(B).
[483] LA. REV. STAT. § 14:130.1(B)(1).
[484] LA. CODE CRIM. PROC. art. 883.
[485] *State v. Amaya-Rodriguez*, 284 So. 3d 654, 663 (La. App. 5th Cir. 11/13/19) (citation omitted).
[486] *Id.* (citation omitted).
[487] St. R. Vol. 6 of 18 at 574, Sentencing Tr., 12/12/17.
[488] *Id.* at 575.

There are five factors which the Court considered in weighing the sentence to impose for this offense.  The Court considered the victim's age, 16; the relationship between Mr. Beckley and the victim.  As her stepfather, Mr. Beckley held an authoritative position, a position of power over Jorion.  The court further considered the presence of semen in and around her genitals and anus, which was evidence that Mr. Beckley sexually violated Jorion.  Mr. Beckley's recorded movement in those early morning hours, leaving the residence, traveling directly to a desolate location to dump Jorion alongside a roadway, was evidence beyond a reasonable doubt that Mr. Beckley executed a premeditated plan to take Jorion's life.  And then, finally, Mr. Beckley's action to conceal the evidence of his crime, made false statements to disparage Jorion's character, all demonstrate a gross disregard or indifference of human life.[489]

At the hearing on Beckley's motion for reconsideration of sentence, the trial court explained as follows:

The Court has given much consideration to Mr. Beckley's request to reconsider the sentence, specifically, the consecutive sentence imposed.

The Court finds that the crime, the crimes – and I want to make that clear for the record, there are two separate and distinct crimes to which Mr. Beckley was convicted of.

The obstruction of justice was the disposal and concealment of the victim.  And it may have been one of the few times in my life where I viewed an image and I involuntarily averted my eyes to what I was looking at.

Society deems the killing of another human being with intent to be the most serious offense under the law.  The concealment of that crime and the other evidence of that crime, specifically, the semen that was found in her body and on her body that belong to you, sir--

\*\*\*

Demonstrated a depraved disregard for the life of someone who was vulnerable.  You deprived her family, her mother and her father, of viewing her as she appeared during life.  Your actions disfigured her corpse.

The Court is denying the request to reconsider sentence.[490]

---

[489] *Id.*
[490] St. R. Vol. 6 of 18 at 581-82, Hearing Tr., 3/1/18.

Initially, Beckley is correct that the obstruction of justice statute does not provide for restriction of benefits.[491]  He, however, has not shown that he was prejudiced by his appellate counsel's failure to raise the issue on appeal because, as he received a life sentence without benefits for his conviction for second degree murder, the imposition of the sentence for obstruction of justice has "no practical effect as defendant will be in jail for the rest of his life unless he is pardoned."[492]

As for Beckley's claim that his appellate counsel should have raised a claim that the consecutive sentences are constitutionally excessive, both the Eighth Amendment to the United States Constitution and Louisiana Constitution Article 1, § 20 prohibit the imposition of excessive punishment.  Louisiana courts, however, have repeatedly upheld the imposition of consecutive sentences for convictions of second degree murder and obstruction of justice.[493]  Further, even if the imposition of *consecutive* sentences is excessive, as previously explained, Beckley has not shown prejudice given that he received a mandatory life sentence without benefits for his conviction of second degree murder.[494]  As a result, Beckley has failed to show that there is a reasonable probability that the outcome of his appeal would have changed had his appellate counsel raised an excessive sentence issue.

---

[491] *See State v. Thompson*, 259 So. 3d 1257, 1273 (La. App. 5th Cir. 11/28/18); *State v. Guidry*, 2016 KA 0465, 2016 WL 6427768, at *8 (La. App 1st Cir. 10/31/16)

[492] *State v. Calloway*, 286 So. 3d 1275, 1280 (La. App. 5th Cir. 12/30/19) (citation omitted).

[493] *Id.* at 1278-80 (and cases cited therein); *State v. Cawthorne*, 257 So. 3d 717, 723-28 (La. App. 3rd Cir. 10/3/18) (consecutive sentences of life imprisonment for second degree murder and forty years for obstruction of justice were not excessive); *State v. Bench*, 256 So. 3d 354, 363-65 (La. App. 3rd Cir. 9/26/18) (same); *State v. Roberson*, 929 So. 2d 789, 804-05 (La. App. 2d Cir. 4/19/06) (same); *State v. Duckett*, 288 So. 3d 167, 176-79 (La. App. 4th Cir. 12/18/19) (consecutive sentences of life imprisonment for second degree murder, fifty years for attempted second degree murder and forty years for obstruction of justice were not excessive).;

[494] *Id.* at 1280; *Duckett*, 288 So. 3d at 179 ("The district court had no discretion in imposing the life sentence.  Therefore, under the circumstances, the sentences for the attempted second-degree murder and obstruction of justice convictions cannot be excessive.").

For these reasons, Beckley has not shown that an excessive claim was clearly stronger than the claims raised by appellate counsel. Nor has he shown that there is a reasonable probability that he would have prevailed had appellate counsel raised such a claim. The state courts' denial of relief on these grounds was neither contrary to nor an unreasonable application of *Strickland*. He is not entitled to relief on this claim.

### g.      Claim 23:  Waiver of Jury Trial

Beckley claims his appellate counsel was ineffective in failing to raise on appeal a claim that Beckley did not waive his right to trial by jury. He claims that the record appellate counsel reviewed did not include any information, including transcripts, a written waiver or a minute entry, demonstrating that he waived his right to a jury trial.

The State responds that the record includes a written waiver of a jury trial executed by Beckley as well as a colloquy between the trial court and Beckley demonstrating that he waived his right to a jury trial.

On December 3, 2018, the Louisiana Fifth Circuit ordered the record to be supplemented with the transcript of the September 17, 2018 hearing at which Beckley waived his right to a jury trial.[495] That transcript was filed with the court on December 19, 2018.[496]

The record reflects that Beckley executed a written waiver of his right to a trial by jury and elected a nonjury trial on September 6, 2017, which was filed in open court on September 9, 2017.[497] The transcript of the September 17, 2018 hearing clearly demonstrates that Beckley elected to waive his right to a jury trial.[498] The trial court conducted a colloquy with Beckley and

---

[495] St. R. Vol. 4 of 18 at 1, La. 5th Cir Order, 18-KA-386, 12/3/18.
[496] *Id.* at 2-38, Hearing Tr., 9/18/17.
[497] St. R. Vol. 7 of 18 at 120, Defendant's Waiver of Right to Trial By Jury Pursuant to Article 780 of the Louisiana Code of Criminal Procedure, 9/6/17.
[498] St. R. Vol. 4 of 18 at 30-35, Hearing Tr., 9/18/17.

determined that Beckley's waiver of his right to a jury trial was knowing, intelligent, and voluntary.[499]

Beckley does not claim that the trial court erred in its conclusion. Rather, he simply argues that there was no evidence in the appellate record demonstrating his waiver.[500] That claim is patently false. He has not shown that the claim regarding his waiver of his right to a jury trial was clearly stronger than those presented on appeal nor has he shown a reasonable probability that such a claim would have been successful had it been presented by appellate counsel.

The denial of relief on this issue was not contrary to or an unreasonable application of *Strickland*. Beckley is not entitled to relief on this claim.

### h.    Claim 24:  Denial of Motion to Suppress

Beckley claims his appellate counsel was ineffective in failing to raise on appeal a claim relating to the denial of motion to suppress items seized from his vehicle. He claims that his vehicle was seized prior to issuance of a search warrant and searched while he was under arrest without a warrant and probable cause making his arrest illegal.

The State responds that the search of the vehicle did not occur until after the search warrant was issued. It concludes that appellate counsel was not ineffective in failing to raise the claim on appeal as it was meritless.

Initially, Beckley had the opportunity to raise the issue himself in his *pro se* supplemental brief on direct appeal. Beckley instead raised an issue regarding the insufficiency of the record. He did not raise any issue relating to the seizure of his vehicle or the denial of the motion to suppress the search of his vehicle. Nor does he provide any valid reason why he failed to do so.

---

[499] *Id.* at 29-34.
[500] ECF No. 17, at 10.

As previously noted, the suppression hearing transcript was included in the appellate record.[501] Further, Beckley was given time to file an additional brief but apparently decided not to do so.[502]

In any event, for the reasons that follow, Beckley has failed to show that the issue he now raises was clearly stronger than those raised by appellate counsel or any resulting prejudice.

The Fourth Amendment permits seizure of personal property believed to contain evidence of a crime pending issuance of a warrant for a search of that property where there are exigent circumstances.[503] Probable cause exists "when a reasonably prudent person could believe, based on the facts and circumstances, that the vehicle contains contraband."[504] Exigent circumstances are assumed if the vehicle is "readily mobile."[505] Whether "the defendant could arrive at any time and drive the vehicle away or remove or destroy evidence in the car" also may be considered.[506] Notably, a warrantless seizure affects only possessory interests and does not implicate a privacy interest.[507]

In this case, defense counsel filed a motion to suppress evidence seized from the residence and Beckley's vehicle.[508] A hearing was held on October 2, 2017, at which time Detective Dewhirst testified.[509] Detective Dewhirst testified that, based on information he had at the time, he asked for the vehicle to be towed.[510] Initially, he testified that, after learning that a box of bungee cords had been found at the residence, he determined that the vehicle should be towed.[511]

---

[501] *See* St. R. Vol. 5 of 18 at 42-80, Hearing Tr., 10/2/17.

[502] St. R. Vol. 4 of 18 at 1, 5th Cir. Order, 18-KA-386, 10/11/18.

[503] *United States v. Place*, 462 U.S. 696, 701 (1983) (citations omitted).

[504] *United States v. Hooker*, 416 F. App'x 467, 471 (5th Cir. 2011) (citations omitted)

[505] *United States v. Cooper*, 949 F.2d 737, 747 (5th Cir. 1991).

[506] *United States v. Ashley*, No. 4:20-cr-318-ALM-KPJ-1, 2022 WL 4375783, at *7 (E.D. Tex. 9/19/22) (citations omitted), *R.&R. adopted*, 2022 WL 4368492 (E.D. Tex. 9/21/22).

[507] *Segura v. United States*, 468 U.S. 796, 810 (1984) (citations omitted).

[508] St. R. Vol. 8 of 18, Motion to Suppress Evidence and Statements, 9/20/17.

[509] St. R. Vol. 5 of 18 at 42-73, Hearing Tr., 10/2/17.

[510] *Id.* at 58.

[511] *Id.* at 51, 53, 57.

When faced with documents showing that the vehicle was towed prior to the issuance of a search warrant for the residence, Detective Dewhirst testified that Price advised that there were bungee cords at the house during her interview.[512]  Dewhirst conceded that "[t]he times may be off as to when we towed the vehicle, did the search warrant on the vehicle, and then the search of the residence."[513]  Dewhirst admitted that Price's recorded interview occurred after the vehicle was impounded.[514]  He, however, explained that he "started talking" to Price and Beckley approximately three hours before their official recorded interviews.[515]  Detective Dewhirst explained that the vehicle was taped up with crime scene tape and towed to headquarters before it was searched pursuant to a warrant.[516]  The search warrant for Beckley's vehicle was issued on April 25, 2016, and executed at approximately 5:17 that morning.[517]  The trial court denied the motion to suppress evidence obtained from the residence and the vehicle.[518]

The record shows that Beckley's vehicle was impounded by St. Charles Parish Sheriff's Office on April 24, 2016, at 2312 hours.[519]  At the time, the vehicle was locked, taped, and secured.[520]  The return of the search warrant of the vehicle indicates that the vehicle was first searched pursuant to a warrant at 5:17 a.m. on April 25, 2016.[521]

While Dewhirst's testimony regarding the timing that he received information that led him to believe that the vehicle was used in the commission of a crime was confusing in that Price's

---

[512] *Id.* at 58-59.

[513] *Id.* at 58.

[514] *Id.* at 59.

[515] *Id.* at 59-60.

[516] *Id.* at 63.

[517] *Id.* at 52.

[518] *Id.* at 65.

[519] St. R. Vol. 8 of 18, St. Charles Parish Sheriff's Office Impoundment, Seizure & Inventory of Motor Vehicle Record, 4/24/16.

[520] *Id.*

[521] St. R. Vol. 8 of 18, Return on Search Warrant, 4/25/16.

official recorded interview and the discovery of the box of bungee cords at the residence both occurred after the vehicle was impounded, the detectives nonetheless had probable cause to believe that the vehicle contained evidence related to the victim's murder.  Beckley admitted that he was the last person to see the victim before she was reported missing.[522]  The victim's nude body was found in the adjoining parish from where she resided with her mother and Beckley.[523]  According to the affidavit in support of the search warrant for the residence, approximately an hour before impounding the vehicle, a family friend advised Detective Savoie that "she noticed as Daniel Beckley informed people of the his [sic] account of the incident he began 'changing his story' between people he spoke to."[524]  Additionally, multiple witnesses observed Beckley cleaning the vehicle and disposing of items in his trunk after the victim went missing.[525]

Additionally, exigent circumstances justified the seizure of Beckley's vehicle suspected in the victim's murder.  At the time of the seizure, Beckley was not under arrest; rather, he was waiting to give a recorded interview.[526]  Beckley could have left the police station and he, or someone else, "would have been free to drive the car away, and perhaps destroy or dispose of evidence, or even the car itself."[527]  Thus, the warrantless seizure of the vehicle pending a search warrant was justified.[528]  Further, because the vehicle was not searched until after a search warrant

---

[522] *See* St. R. Vol. 8 of 18, Kenner Police Report, at 3, 10/10/17.

[523] *See id.* at 2.

[524] St. R. Vol. 8 of 13, Affidavit for Search and Seizure Warrant, at 2, 4/25/16.

[525] *See id.*

[526] *See* St. R. Vol. 5 of 18 at 263, 266, Trial Tr., 10/11/17 (Detective Dewhirst).

[527] *Ashley*, 2022 WL 4375783, at *7 (citations omitted).

[528] *Id.* (probable cause and exigent circumstances existed to seize defendant's truck which was believed to contain evidence of the victim's murder); *United States v. Beard*, No. 3:20-CR-0567-B, 2022 WL 1321549, at *10 (N.D. Tex. 5/3/22) (probable cause to seize vehicle existed where officers had seen Beard load bags into the truck believed to contain evidence relating to the murder of his child's mother).

was secured, the initial seizure affected only Beckley's possessory interest in the vehicle and did not implicate a privacy interest.[529]

Beckley fails to show that a claim that the trial court erred in denying the motion to suppress the search of his vehicle was clearly stronger than those claims raised on appeal by his counsel. Nor has he shown that there is a reasonable probability that the outcome of his appeal would have been different had appellate counsel raised the issue. The state courts' denial of relief under *Strickland* is not contrary to or an unreasonable application of clearly established law. He is not entitled to relief as to this claim.

### i.    Claim 25: Violation of the Right to Confrontation

Beckley next claims that his appellate counsel was ineffective for failing to raise on appeal a claim that his right to confrontation was violated when Dr. Brogle did not testify at trial. Beckley argues that Detective Dewhirst testified at a December 13, 2016 hearing to information given to him by Dr. Brogle that Adderall was found in the victim's system but was not the cause of her death.

The State responds that Beckley fails to show ineffective assistance of appellate counsel for the same reasons he failed to show ineffective assistance of trial counsel for failure to call Dr. Brogle.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Confrontation Clause therefore prohibits admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a

---

[529] *Id.* (citation omitted).

prior opportunity for cross-examination."[530]    *Crawford* indicated that testimonial statements include "ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially."[531]

Initially, the testimony from Detective Dewhirst cited by Beckley was given at the December 13, 2016 hearing related to jurisdiction and venue.[532]    Louisiana law provides that hearsay rules do not apply at pretrial hearings.[533]    Furthermore, it has been established that a petitioner forfeits his claim of a Confrontation Clause violation if he fails to object to the inadmissible hearsay testimony on confrontation grounds.[534]

As previously explained, Beckley was afforded the right at the hearing to cross-examine Dr. Eserman, who conducted the autopsy of the victim.    While the State did not call Dr. Brogle as a witness at trial, it is clear from the record that Dr. Brogle relied on the findings of Dr. Eserman and Minnich's crime scene investigation to classify the victim's death as a homicide.    Defense counsel cross-examined both Minnich and Eserman at trial.[535]

Beckley has not shown that his right to confrontation of Dr. Brogle was violated.    He has not demonstrated that a claim relating to this issue would have been clearly stronger than those

---

[530] *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

[531] *Id.* at 51, 124 S.Ct. 1354 (internal quotation and citation omitted); *see generally Bullcoming v. New Mexico*, 564 U.S. 647, 658 (2011) (recognizing the *Crawford* standard as the controlling doctrine of the Court).

[532] *See* St. R. Vol. 7 of 18, Hearing Tr., at 13, 12/13/16.

[533] *State v. Harris*, 998 So. 2d 55, 56 (La. 12/19/08) (per curiam) (right to confrontation is not implicated in pretrial matters); *State v. Heider*, 101 So. 3d 1025, 1029 (La. App. 3rd Cir. 10/3/12) (citation omitted) ("The confrontation right does not apply to pretrial hearings, so Defendant's argument regarding the *Daubert* hearing lacks merit."); *State v. Ayo*, 7 So. 3d 85, 97 (La. App. 5th Cir. 3/24/09) ("the confrontation clause does not apply to a pretrial hearing").

[534] *See Moya v. Sullivan*, No. 07-01598 VAP (AN), 2010 WL 1023940, *8 (C.D. Cal. Jan. 22, 2010) (failure to object in the trial court on confrontation grounds prevents State from attempting to overcome objection by producing absent declarant), *R.&R. adopted*, 2010 WL 1023943 (C.D. Cal. Mar. 16, 2010).

[535] St. R. Vol. 5 of 18, 152-56, Trial Tr., 10/10/17; *id.* at 225-33, Trial Tr., 10/11/17.

raised by appellate counsel on appeal. Nor has he demonstrated that there is a reasonable probability that he would have prevailed on the issue had it been raised by his appellate counsel.

The state courts' denial of relief under *Strickland* was not contrary to or clearly in violation of established law. Beckley is not entitled to relief as to this claim.

### j.        Claim 26:  Prosecutorial Misconduct

Beckley claims that his appellate counsel was ineffective for failing to raise on appeal a claim that the prosecution committed misconduct when it advised the trial court that it had complied with its order to provide the defense with a copy of the audio of the "re-interview" of Beckley.

As previously explained in section IV(C), the record does not support Beckley's claim that the State failed to abide by the trial court's order relating to the "re-interview" or that it made any false statement to the trial court when it advised that Beckley had been given a copy of the audio/video. Beckley has not shown that a claim of prosecutorial misconduct would have been clearly stronger than those issues raised by appellate counsel. Nor has he shown a reasonable probability that he would have prevailed on this issue on appeal but for his counsel's failure to raise the issue.

The denial of relief on this issue was not contrary to or an unreasonable application of *Strickland*. Beckley is not entitled to relief on this claim.

### k.        Claim 27:  *Brady* Violation

Beckley claims that his appellate counsel was ineffective for failing to raise on appeal an issue that the State violated *Brady* when it failed to provide the defense with a copy of the Kenner Police Department report prior to trial.

The State responds that the report was not in possession of the State prior to trial and that the report did not include any new information. It concludes that Beckley's appellate counsel was not ineffective and that Beckley did not suffer any prejudice.

As previously explained in section IV(B), Beckley fails to show that he was prevented from effectively using the police report at trial after it was disclosed. As a result, Beckley has not demonstrated that his appellate counsel was ineffective for raising a *Brady* claim as it relates to his trial, or that there is a reasonable probability that he would have prevailed on the claim had his appellate counsel raised it.

To the extent that he contends that his appellate counsel should have raised an issue that the late disclosure affected the outcome of the suppression hearing, he is also not entitled to relief. Beckley claims that the Kenner Police Report shows that his vehicle was seized without a warrant in violation of the Fourth Amendment. However, the fact that law enforcement did not have a warrant authorizing seizure of the vehicle was information known to the defense at the time of the suppression hearing.

With the exception of the disclosure of the Kenner Police Department report, all discovery was satisfied by September 22, 2017.[536] At the time of the suppression hearing on October 2, 2017, the evidence in the defense's possession showed that the vehicle was impounded at 23:12 on April 24, 2016.[537] The search warrant for the vehicle was approved at 5:12 a.m. and executed at 5:17 a.m. on April 25, 2016.[538] Furthermore, the trial court, in denying the motion to suppress, was aware that the vehicle had been towed without a warrant. Specifically, in examining Detective Dewhirst at the suppression hearing, defense counsel brought out the fact that the vehicle was

---

[536] St. R, Vol. 7 of 14, at 58, Docket Master Entry (16-0468), 9/22/17.
[537] St. R. Vol. 8 of 18, St. Charles Parish Sheriff's Office Impoundment, Seizure & Inventory of Motor Vehicle Record, 4/24/16.
[538] St. Rec. Vol. 5 of 18 at 52, Hearing Tr., 10/2/17; St. Rec. Vol. 6 of 18 at 354, Trial Tr., 10/12/17.

towed before the search of the residence occurred.[539]  Detective Dewhirst acknowledged that the times did not match up and ultimately testified that the information he had at the time provided the reason for towing the vehicle.[540]

Beckley has not shown that a *Brady* claim was clearly stronger than those claims raised by appellate counsel.  Nor has he shown that there is a reasonable likelihood that the claim would have succeeded had it been raised on appeal.

The state courts' determination was not contrary to or involved an unreasonable application of *Strickland*.  Beckley is not entitled to relief as to this claim.

### l.    **Claim 22:  Incomplete Record**

Beckley's final claim is that his appellate counsel was ineffective in failing to investigate and secure a complete record of the court proceedings.  He contends that the appellate record was missing fourteen transcripts of court proceedings and all the filings from the original court cases.

The State responds that Beckley himself raised on direct appeal an issue of an incomplete record, and that claim was denied by the state courts; therefore his appellate counsel did not render ineffective assistance.

Initially, Beckley reliance on *Hardy v. United States*[541] for his argument that the entire court record is constitutionally required is misplaced.  *Hardy* did not involve a state criminal trial; rather it addressed "the statutory scheme [under the Court Reporter Act, 28 U.S.C. § 753] and d[id] not reach a consideration of constitutional requirements."[542]  As previously explained, the appellate record was clearly adequate for the courts to adjudicate the claims raised by appellate

---

[539] St. Rec. Vol. 5 of 18 at 54-60, Hearing Tr., 10/2/17.
[540] *Id.* at 58.
[541] 375 U.S. 277, 278-79 (1964).
[542] *Higginbotham v. Louisiana*, 817 F.3d 217, 222 n.6 (5th Cir. 2016) (citing *Hardy*, 375 U.S. at 278, 282).

counsel on direct appeal. "[A]ppellate counsel does not perform deficiently, and no prejudice results, as a result of counsel's failure to order portions of the record that are irrelevant to the claims asserted."[543]

To the extent that Beckley claims that appellate counsel should have asserted additional claims arising from the portions of the proceedings not included in the appellate record, that claim also fails. Beckley has not shown that any errors occurred during the portions of the proceedings that were not included in the appellate record. Further, Beckley must show that the issues appellate counsel failed to raise were clearly stronger than the issues presented on appeal.[544] For the reasons explained in sections IV(E)(a-k), Beckley has not shown that any of his claims were clearly stronger than the ones raised by appellate counsel on direct appeal. Nor has he shown a reasonable probability that he would have prevailed on appeal had his appellate counsel raised the issues.

Beckley fails to show that the state courts' determination was contrary to or involved an unreasonable application of *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. He is not entitled to relief as to this claim.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Daniel Lee Beckley's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from

---

[543] *Massey v. Cain*, No. 14-2952, 2016 WL 5376239, at *13 (E.D. La. 6/21/2016), *R.&R. adopted*, 2016 WL 5362992 (E.D. La. 9/26/16).
[544] *See, e.g.*, *Diaz*, 228 F. App'x at 427; *accord Smith*, 528 U.S. at 288.

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.[545]

New Orleans, Louisiana, this _____2nd_____ day of March, 2023.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE

---

[545] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*) (citing 28 U.S.C. § 636(b)(1)).  *Douglass* referred to the previously applicable ten-day period for filing of objections, which was extended to fourteen days by amendment effective December 1, 2009, 28 U.S.C. § 636(b)(1).